**AMF INCORPORATED, Plaintiff, Appellant,**

v.

**Raymond L. JEWETT, et al., Defendants, Appellees.**

**No. 82–1416.**

United States Court of Appeals, First Circuit.

Argued Nov. 2, 1982.

Decided July 8, 1983.

As Modified on Denial of Rehearing and Rehearing En Banc Aug. 26, 1983.

Gregor F. Gregorich, New York City, with whom Thayer Fremont-Smith, William R. Golden, Jr., David C. Stimson, Rogers Hoge & Hills, New York City, and Choate,

Hall & Stewart, Boston, Mass., were on brief, for plaintiff, appellant.

Robert D. Paul, Boston, Mass., with whom Martha Coakley, and Goodwin, Procter & Hoar, Boston, Mass., were on brief, for defendants, appellees.

Before CAMPBELL and BREYER, Circuit Judges, and HEMPHILL,[*] Senior District Judge.

LEVIN H. CAMPBELL, Chief Judge.

AMF appeals from the denial of its motion to hold the defendants Raymond Jewett and Walthem Chemical Pump Corporation (Walchem) in civil contempt of a consent decree. The decree permanently enjoins Jewett and Walchem from using AMF's trademarks, trade names, and parts and model numbers in connection with the sale of chemical metering pumps and related components. Alleging that defendants had violated the decree, AMF moved, pursuant to a provision in the decree retaining jurisdiction, for an order holding Jewett and Walchem in civil contempt and awarding damages. Following lengthy discovery and an eight-day trial, the United States District Court for the District of Massachusetts issued a memorandum and order denying AMF's motion.

## I.

AMF and Jewett have been involved in business dealings since 1973. In May of that year, AMF purchased from Jewett and an associate the assets of the Precision Control Products Corporation, a company that produced and sold Precision chemical metering pumps. Through this purchase, AMF obtained the rights to the trade names "Precision Control Products," and "Precision," to the trademarks "Sentrol," "Diaton," and "PCP," and to the copyrights, model numbers, manufacturing methods, and labels used in the production and sale of metering pumps. Jewett, who had been president of the company prior to its acquisition, accepted employment with AMF and

---

[*] Of the District of South Carolina, sitting by designation.

agreed not to compete in the chemical pump business for a stated period thereafter.

Eleven months after purchasing Precision Control Products, AMF transferred the company from Waltham, Massachusetts to Meriden, Connecticut, as a part of the AMF Cuno Division. Jewett resigned from his position with AMF and formed a new corporation at the company's old location in Waltham. As its name—Precision Chemical Pump Service Corporation—implied, Jewett's new venture was an authorized service center for AMF Precision pumps. In March 1975 Jewett assumed a distributor function as well as a service function, and changed his company's name to Precision Chemical Pump Corporation.

In the fall of 1976, after his non-competition agreement with AMF expired, Jewett acquired an interest in Liquid Metronics, a newly formed company that was beginning to compete with AMF. When Jewett informed AMF of his interest in Liquid Metronics, AMF terminated Jewett's authorized dealer and service center contracts and demanded that Jewett cease doing business under the name Precision. Jewett refused and AMF brought suit in May 1977, alleging that Jewett's unauthorized use of the name Precision violated the Lanham Act, 15 U.S.C. §§ 1051–1127, and related state laws proscribing unfair methods of competition.

The parties' settlement negotiations culminated in the consent decree at issue here. The decree, which is set forth in the appendix hereto, was approved by the court on September 15, 1977.

In June 1980, three years after entry of the decree, AMF brought this motion for an order holding Jewett and Walchem in civil contempt. The contempt proceeding was heard by a judge other than the one who had handled AMF's initial suit and had approved the consent decree. In denying the motion, the district court concluded that AMF had failed to establish clearly and convincingly that defendants had violated the decree. The court also held that the terms of the consent decree were ambiguous, that defendants had used their best efforts to comply, and that AMF failed to show that certain technical violations of the decree were likely to cause confusion among customers as to the origin of certain Walchem products.

## II.

The parties vigorously dispute the nature of the standard by which this court should review the district court's interpretation of the consent decree. We decline an extended exegesis, but some discussion seems necessary.

 We start with the principle that the complainant must prove contempt by clear and convincing evidence. *See Burke v. Guiney,* 700 F.2d 767, 769 (1st Cir.1983); *Vertex Distributing, Inc. v. Falcon Foam Plastics, Inc.,* 689 F.2d 885, 889 (9th Cir. 1982); 11 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2960 at 591. Another even more familiar principle is that the district court's findings of fact are not to be set aside unless clearly erroneous. *See* Fed.R.Civ.P. 52(a); *Kittitas Reclamation District v. Sunnyside Valley Irrigation District,* 626 F.2d 95, 98 (9th Cir. 1980), *cert. denied,* 449 U.S. 1079, 101 S.Ct. 861, 66 L.Ed.2d 802 (1981). Together these principles suggest that a district court's refusal to find contempt should not be overturned lightly.

 It does not follow, however, that the district court's actions are unreviewable. Here there was little dispute as to defendants' actual conduct. The controversy at the trial centered largely on the interpretation of defendants' activities in light of the meaning and purpose of the decree. We have referred to this process of interpretation as analogous to the interpretation of contracts. *See Massachusetts Association for Retarded Citizens, Inc. v. King,* 668 F.2d 602, 607 (1st Cir.1981) (citing *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975)). Courts of appeal have considerable freedom to review the district court's determination of such matters, which are often characterized, whether or not correctly, as "questions of law." *Vertex Distributing,*

689 F.2d at 892; *Eaton v. Courtaulds of North America, Inc.,* 578 F.2d 87, 90 (5th Cir.1978). *Cf.* 3 *Corbin on Contracts* § 554 (1960) (issues of contract meaning are actually all questions of fact although some are for the court alone rather than for the jury).

Courts, to be sure, have also spoken of reviewing the district court in contempt matters only for an abuse of discretion. *See Washington-Baltimore Newspaper Guild v. The Washington Post Co.,* 626 F.2d 1029, 1031 (D.C.Cir.1980); *V.T.A., Inc. v. Airco, Inc.,* 597 F.2d 220, 226–27 (10th Cir. 1979). Even under that standard, however, the lower court's construction of the meaning of language in a consent decree is subject to closer scrutiny than is likely appropriate as to ordinary factual questions. *See, e.g., United States v. ITT Continental Baking Co.,* 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975) (reversing lower court's interpretation of the term "acquiring").

The reason for differing articulations of the standard of review undoubtedly lies in the wide variety of circumstances in which contempt proceedings may arise. A civil contempt proceeding involving a commercial consent decree involves different considerations from one involving, say, a defaulting spouse under a support order. In dictum that has come to be regarded as the leading statement of the complaining party's right to a remedial order upon a showing of a violation of an injunction and resultant injury, Judge Magruder distinguished between coercive contempt proceedings and remedial proceedings of the sort involved here, stating that

> [i]f the complainant makes a showing that respondent has disobeyed a decree in complainant's favor and that damages have resulted to complainant thereby, complainant is entitled as of right to an order imposing a compensatory fine. The court has no discretion to withhold the appropriate remedial order. In this respect, the situation is unlike that of criminal contempt where the court may withhold punishment for the past act of disobedience. An order imposing a compensatory fine in a civil contempt proceeding is thus somewhat analogous to a tort judgment for damages caused by wrongful conduct.

*Parker v. United States,* 153 F.2d 66, 70 (1st Cir.1946) (citations omitted). *See also G & C Merriam Co. v. Webster Dictionary Co.,* 639 F.2d 29, 41 (1st Cir.1980); *Vuitton et Fils, S.A. v. Carousel Handbags,* 592 F.2d 126, 130 (2d Cir.1979); Rendleman, *Compensatory Contempt: Plaintiff's Remedy When a Defendant Violates an Injunction,* 1980 U.Ill.L.F. 971, 979.

This court has observed that in interpreting consent decrees entered into by private parties, courts adhere more closely to contract principles than when interpreting broader, programmatic decrees entered into in public law litigation, where a more flexible approach may be required. *See Massachusetts Association for Retarded Citizens, Inc. v. King,* 668 F.2d at 607–08. Private commercial disputants typically understand the business realities of their agreements and broader questions of public policy are not implicated. A civil finding of contempt in the private context essentially triggers a payment of money damages as in garden variety tort or contract litigation. There is no risk of the kinds of societal disruptions that may be threatened in the public law context where judicial discretion may well be crucial to securing complex legal goals. Those who give up the advantages of a lawsuit in return for obligations contained in a negotiated decree, rely upon and have a right to expect a fairly literal interpretation of the bargain that was struck and approved by the court.

This is not to say that a court should construe an ambiguous decree against the party burdened with compliance. The Federal Rules of Civil Procedure provide that "[e]very order granting an injunction ... shall be specific in terms [and] shall describe in reasonable detail ... the act or acts sought to be restrained." Fed.R.Civ.P. 65(d). This provision has been interpreted as a bar to the enforcement of decrees too vague to inform the burdened party "what the court intends to require and what it

means to forbid." *International Long-shoremen's Association, Local 1291 v. Philadelphia Marine Trade Association,* 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967). An order, however, need not spell out "the components of a term whose boundaries are understood by common parlance." *United States v. Professional Air Traffic Controllers Organization,* 678 F.2d 1, 3 (1st Cir.1982). Nor is a decree unenforceably vague simply because a dispute later arises over the meaning of some of its terms.

We do not view the present case as one in which we confront acts alleged to violate "a decree that can only be described as unintelligible." *International Longshoremen's Association, Local 1291 v. Philadelphia Marine Trade Association,* 389 U.S. at 76, 88 S.Ct. at 208. Unlike the situation in *Local 1291,* defendants were closely involved, with assistance of counsel, in the negotiation of the decree and were obviously interested in obtaining, and did in fact obtain, a reasonably clear statement of the practices from which they were to abstain. This was not, as in *Local 1291,* a decree ordering compliance with an abstract proposition of law.

■ In particular we disagree with the district court that this decree is fatally ambiguous with respect to matters such as (1) whether "flowmeters" are "related components"; (2) whether paragraph 6 qualifies the absolute prohibitions in paragraphs 1(a) and 1(b); and (3) whether the word "fill" in paragraph 1(f) requires consent prior to shipment of non-AMF products. In reaching the results we do, we are guided by the language of the decree, the circumstances surrounding its formation, and its purposes—in brief, by the usual considerations of contract interpretation. *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975). In matters fairly open to debate, we have deferred to the conclusions of the district court.

We turn now to the specific allegations of contempt.

### III.

#### 1. Directory Listings

AMF contends that the district court erred in not ruling that various directory and telephone listings which appeared after entry of the decree on September 15, 1977, were in violation thereof. Paragraph 1(b) prohibits defendants from using "Precision" and "Precision Chemical Pump Corporation" in connection with the sale, advertisement, or distribution of chemical metering pumps. Notwithstanding this prohibition, the 1978 Thomas Register, a well-known industrial directory, and the Western Union 1980 Telex Buyer's Guide, both listed Walchem under the name "Precision Chemical Pump Corporation." The 1980–1981 West Suburban Telephone Directory listed Walchem's telephone number not only under Walchem but under the heading "Precision Control Products Corp." And the 1979, 1980 and 1981 Boston Telephone Directories listed Walchem's number solely under the name "Precision Chemical Pump Service Company," with "See Waltham Chemical Pump Corp." in smaller print underneath. Insofar as the record reveals, there was no separate directory listing under Waltham Chemical Pump Corp. or the like.

Defendants' explanation for these listings, which continued with the name the decree had ordered them to forego, was that they had appeared in spite of their good faith efforts to eliminate all references to Precision in the various directories. As evidence of their good faith, they pointed to a statement of compliance filed with the court in 1977, shortly after the decree was entered, which included both a letter notifying the New England Telephone Company that Walchem's "corporate name" had been changed, and a telex requesting Western Union's credit department to update its records to reflect the change. Defendants also pointed out that the improper 1978 Thomas Register listing was immediately corrected. And after this contempt proceeding began, defendants at last took definitive steps to eliminate the listings.

The district court found that Jewett had not acted in defiance of the decree but had

taken "the appropriate steps necessary for compliance." In the cases of Thomas, Western Union and the West Suburban Telephone listings, it found these had appeared despite express instructions to the contrary, and that appropriate and timely corrective measures had been taken. As to the Boston Directory listings in 1979, 1980 and 1981, the court held that these did not suggest that the two companies—Walchem and Precision Chemical Pump—were one and the same. The court felt these were no more misleading than certain name change notices allowed under the consent decree.

■ We find no error in the court's ruling as to Thomas. The record suggests that Jewett had written Thomas early in 1978 protesting the 1978 listing. There is a letter from Thomas around the same time acknowledging that the listing "was not ordered by you, Mr. Jewett" and would be "killed" in the future.

■ We have considerably more difficulty with the court's other rulings on this issue. Walchem's only action in 1977 regarding Western Union was a telex addressed to its *credit department* dated September 2, 1977, requesting it to change its records to reflect "our new name," i.e., Walchem. There was no reference to changing the Buyer's Guide listing. Presumably the credit department would be concerned only with billing and the like. Predictably, defendant was listed under the prohibited "Precision" name in the 1980 Buyer's Guide. Defendants took no determined action until July 28, 1980, two months after this contempt proceeding had been brought, at which time they requested deletion of the old name in future editions of the Buyer's Guide.

Defendants' conduct was similarly inadequate as to the West Suburban and Boston telephone directory listings. In August 1977 Jewett wrote to the New England Telephone Company's Arlington office notifying it only that Precision's corporate name had been changed to Walchem, and that its address and number were unchanged. The letter contained no request for any particular directory action, and the West Suburban directory apparently continued to list the firm under the old Precision name (as well as Walchem) through 1980–1981. Meanwhile, and most flagrantly, the Boston telephone books for 1979, 1980 and 1981 listed the new name merely as a subordinate cross-reference under the Precision name, which continued to be the firm's primary Boston listing. In 1981, after the contempt motion was brought, defendants for the first time wrote letters to a service representative of the telephone company requesting deletion of the Precision listings in both directories. Why such action was not taken two or more years earlier was not explained.

On such a record, we think the district court erred in holding that Walchem and Jewett had taken "reasonably appropriate steps necessary for compliance." The court went on to blame the continued listings on the "mistakes or omissions of the telephone company [and] Western Union." But the feeble 1977 letters to the telephone company's Arlington office and to Western Union's *credit office* were hardly calculated to effect directory changes. And even assuming defendants felt they were, they were clearly on notice by 1979 and 1980 that their efforts had failed, particularly when the Boston telephone directory continued to list them primarily under the Precision name.[1]

---

1. Jean Quong, a customer service representative at Walchem who handled telephone orders and correspondence, testified that she only became aware of the Boston listing after the contempt proceeding, when a customer called expecting to speak to the representatives of a company named Precision. Quong then checked the phone book, discovered the listing, and discussed the matter with Jewett and another customer service representative, Paul Olofson. If this testimony was intended to suggest that no one at Walchem—located in Greater Boston a few miles from Boston proper—had found out for over two years that Walchem was listed as Precision in the Boston directory, we would regard this as incredible. And even assuming this were so, plaintiff, after settlement of its lawsuit and with the benefit of a consent decree, was entitled to a greater level of responsibility on defendants' part.

Paragraph 1(b) outlawed the words "Precision" and "Precision Chemical Pump Corporation" in connection with the sale, advertisement or distribution of chemical metering pumps. Paragraph 3 directed defendants to abandon the Precision name. At very least, those provisions called for substantial good faith efforts to see that the Precision name did not appear in a Western Union Buyer's Guide or in the telephone directories.[2] We see no ambiguity in this regard, nor was the evidence less than "clear and convincing" that defendants' actions were below whatever reasonable standard of effort one might infer. There is no scienter requirement for a finding of civil contempt. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *Commodity Futures Trading Commission v. Premex, Inc.,* 655 F.2d 779, 782 (7th Cir.1981). Even assuming that the court could decline to find contempt had defendants taken all reasonable steps, without success, to comply, we see no basis to find here that defendants came even close to taking reasonable measures. After going through the motions of compliance by writing letters in 1977, defendants sat idly by for the next two years knowing, or having reason to know, that the old name was continuing to be used. We do not think the court could in such circumstances refuse a finding of civil contempt.

### 2. *Drop Shipments of Flowmeters*

AMF contends that the district court erred in refusing to find that Walchem violated the decree by shipping non-AMF "flowmeters" in cartons that were labelled with the prohibited marks PCP, AMF, Cuno, and the name Precision. Walchem obtained these flowmeters, devices used as external pacing mechanisms on certain models of pumps, from the same German firm, Hydrometer, that supplies AMF

flowmeters. Recognizing that Walchem's flowmeters were functionally equivalent to their AMF counterparts, Stephen Kalish—the president of a company, Precision Control Products of Madison, Wisconsin, that was authorized to distribute AMF Precision products—purchased ten Walchem flowmeters to fill existing orders from his customers. Kalish then arranged for Walchem to drop-ship them directly to designated downstream purchasers. He provided labels, invoices, and instruction booklets which Walchem included with the drop-shipped flowmeters. These shipping papers bore the name Precision Control Products, and the trademarks AMF, Cuno, and PCP—all marks that Kalish used under the terms of his distribution agreement with AMF when selling AMF products. When the Walchem flowmeters reached Kalish's customers, they were packaged like AMF Precision flowmeters. While AMF labels were not attached directly to the flowmeter itself, the instruction booklet that accompanied the product read, "AMF, CUNO, Precision Control Products, 200 Series, Flowmeter . . . Instructions." Kalish testified that he did not know what could have told the customer that it was not an AMF Precision flowmeter.

AMF points to paragraphs 1(a) and 1(b) of the decree, which it contends, prohibit defendants from using its various marks in connection with the distribution of pumps or "related components." AMF argues that flowmeters are "related components" within the meaning of the decree and that Walchem used the prohibited marks in connection with their distribution by inserting Kalish's labels and booklets into the boxes and shipping them to Kalish's customers.

The district court found no evidence of contempt. The court believed that any prohibition in paragraphs 1(a) and 1(b) against

---

**2.** That Walchem's telephone listing was to be in that name solely, and not in the Precision name, is underscored by clause (iv) of paragraph 1(b) which specifically granted Walchem a period of one year—through August 30, 1978—during which directory assistance operators would be allowed to respond to requests for the telephone number of Precision Chemical Pump Corporation by informing callers that the name had been changed to Waltham Chemical Pump Corporation (Walchem), and to give them Walchem's number. This would make no sense at all if Walchem could continue with the listings here in issue.

defendants' use of the marks AMF, Cuno, PCP, and Precision extended only to the use of such marks in connection with the distribution of pumps or "related components." Thus, the court reasoned, the flowmeter shipments violated the decree only if the parties understood the term "related components" as including flowmeters. The parties vigorously disputed this issue at trial,[3] but the court declined to rule on it definitively. Rather, the court stated that it would be unjust to hold the defendants in contempt for failing to adhere to AMF's interpretation of an ambiguous term.

The court also reasoned that because Kalish knew that *his* customers were to receive non-AMF products, there was no likelihood of confusion resulting from the flowmeter transactions. Such a finding implicitly reflects the district court's view that paragraphs 1(a) and 1(b) only prohibit such use of AMF's trademarks as is likely to cause confusion or mistake among purchasers, an interpretation made explicit in another section of the opinion. The court articulated two reasons for rejecting AMF's contention that the decree prohibited any use by Walchem of the listed trademarks without regard to the likelihood of resulting confusion. First, the court reasoned that such a construction would run counter to paragraph 6, which authorizes defendants to sell new AMF products with their original labels, bulletins, and literature. Second, the court pointed to what it viewed as an ambiguously worded section of paragraph 1(b) insofar as that paragraph related to defendants' use of AMF's marks "Sentrol," "Diaton," "AMF," and "Cuno." The court did not explain how this ambiguity justified applying the likely confusion standard to the use of such prohibited marks as Precision and PCP as well.

We thus face on appeal the questions whether the district court erred in refusing to rule that flowmeters are related components and in reading paragraphs 1(a) and 1(b) to prohibit only such use of AMF's marks as is likely to cause confusion. We believe the court erred on both points.

We base our conclusion that flowmeters are "related components" on what seems to us the only meaningful interpretation of the decree. The decree enjoins Walchem from using AMF's trademarks and trade names in connection with sale of pumps and related components. Because the decree was drafted to protect AMF's marks, the term "related components" can be sensibly interpreted only as a broad description of parts, accessories and equipment related to chemical metering pumps. Otherwise the decree would prohibit defendants from using AMF's marks in connection with one class of products defined as "related components" while authorizing such use in connection with a second class of products defined as accessories or related equipment. The whole thrust of the decree, however, was that defendants were not to make any use of AMF's marks, except insofar as such marks appeared on original AMF products resold in their original containers, or on products sent to defendants for servicing. A broad interpretation of the term "related components" to encompass any part or accessory customarily used in connection with metering pumps finds support in Jewett's affidavit where he expressed his understanding that the decree prohibited *all* use of the terms "PCP" and "Precision." In arguing now that flowmeters are not related components, Walchem argues essentially that it should have the right to appropriate those marks simply because the term "related components" may not, technically, include accessories in every circumstance. Plainly, the decree did not anticipate such a fine-spun distinction. Our

---

**3.** At trial, the director of AMF's Precision pump division testified that the model "17,000" Precision pump was inoperable without a flowmeter, making a flowmeter a component of that particular pump. AMF also introduced a dictionary entry defining "component" as "a simple part or a relatively complex entity regarded as a part, system, [or] element." Finally, AMF introduced evidence that both parties listed flowmeters as "parts," a term that it contended was synonymous with "components." Walchem argued that flowmeters were "accessories" to and not "components" of chemical metering pumps. Jewett so testified, pointing to AMF's catalog which listed flowmeters as "accessories."

interpretation does not preclude Walchem from selling its own line of flowmeters; it only prohibits the use of AMF's marks in connection with such sales. Thus, Jewett's statement that he would not have signed the decree if he had understood it as prohibiting Walchem's sale of flowmeters has little relevance to the question whether flowmeters are sufficiently identified with chemical metering pumps to be considered related components for purposes of the prohibitions in paragraphs 1(a) and 1(b). They clearly are.

The district court also erred in rejecting AMF's contentions that paragraphs 1(a) and 1(b) prohibit Walchem from using the eight trademarks and service names listed in the decree without regard to the likelihood of resulting confusion.

That the decree contained paragraph 6—which allows Walchem to sell new AMF products in their original cartons, and to use AMF literature bearing the Precision trademarks in connection with these sales—provided no reason for an expanded likelihood-of-confusion standard in paragraph 1(b). Letting Walchem use the Precision trademarks in connection with the sale of genuine AMF products in their original containers was not inconsistent with an otherwise broad directive against use of such trademarks in connection with non-AMF pumps and components.

The decree, moreover, flatly prohibited Walchem from using the marks "PCP," "Precision," and "Precision Chemical Pump Corporation." As to these marks, there was no justification to imply a likelihood of confusion limitation. Jewett conceded as much in his own testimony. He stated that Walchem "could not as a company use PCP or Precision ... on any of [its] products." Notably absent from this testimony was any suggestion that the prohibition applied only where confusion was established.

With respect to the trademarks Sentrol, Diaton, AMF, and Cuno, the text of paragraph 1(b) is somewhat less specific. It literally bars only the use of words *so similar* to Sentrol, Diaton, AMF and Cuno

as to be likely to cause confusion or mistake, etc. But if words so similar to the four trademarks as to cause confusion or mistake are barred, the implication is strong that use of the marks themselves is barred a fortiori. Not only does the content of the decree as a whole, as well as common sense, support this construction, it is specifically confirmed in paragraph 2. Paragraph 2 directs defendants to surrender for destruction all materials in their possession,

which bear the notations "PCP," "Precision," "Precision Control Products" or "Precision Chemical Pump Corporation" or which bear any other simulation of the foregoing trademarks or tradenames, or of plaintiff's registered trademarks "Sentrol," "Diaton," "AMF," and "Cuno," or which bear *any other representation or statement in violation of the injunction.*

(Emphasis supplied.) Not only does the required destruction of these materials show that the trademarks Sentrol, Diaton, AMF, and Cuno are foreclosed to defendants, the underscored language places them expressly within the class of representations that violate the injunction. We conclude, therefore, that paragraph 1(b) was intended to prohibit the specified uses of the marks Sentrol, Diaton, AMF, and Cuno without regard to the likelihood that confusion will result therefrom.

As the term "related components" included flowmeters, and as the decree prohibited any use by Walchem of the Precision trademarks in connection with the distribution of such components, the drop-shipments violated the decree. And this was no mere technical violation. Jewett and his employees knew that they were to refrain from using the AMF marks "PCP" and "Precision" in connection with the sale of flowmeters. Jewett admitted as much during his deposition, where he stated that "if we were shipping and billing to a customer as Walchem, [w]e certainly would not have sent that meter out as a Precision meter." He contended at trial, as he does here, that the drop-shipments were simply ministerial acts performed for the benefit of Kalish and were thus saved from illegality.

Defendants' attempt to portray themselves as the innocent agents of Kalish cannot be squared with the facts, however. Walchem's flowmeters were virtually identical to their AMF counterparts and were packed in cartons with Precision shipping labels and AMF Cuno flowmeter instructions. The recipient of such a product could scarcely have suspected it was anything but a genuine Precision flowmeter, as Kalish's testimony reflects. Walchem not only profited from the deception of downstream purchasers, it played an active role in accomplishing the deceit. As a party under a court order that prohibited it from using the trademarks, Walchem clearly had an obligation to do "more than show how close it could come with safety to that which [it was] enjoined from doing." *AMF, Inc. v. International Fiberglass Co.*, 469 F.2d 1063, 1065 (1st Cir.1972). Here, defendants adopted the posture of innocence without accepting the obligations of compliance, and we think the district court erred in refusing to find them in contempt.

### 3. *Sales Through Precision Distributors*

AMF argues that the district court incorrectly concluded that Walchem had not violated the decree in selling pumps and products from non-AMF sources to authorized Precision distributors, knowing that they would be resold as genuine AMF products. AMF argues essentially that in selling to AMF Precision dealers with knowledge that the products would be resold to less sophisticated downstream purchasers under the Precision name, defendants violated paragraph 1(b) by appropriating the name Precision and its related goodwill in connection with the "distribution" of chemical metering pumps. To establish that defendants knew that their products would be resold with AMF Precision labels and literature, AMF points both to Jewett's familiarity with the sales practices of various Precision dealers and to defendants' use of Precision labels and literature in connection with the flowmeter shipments discussed in the previous section.

The district court determined that Walchem had sold products from its own sources to authorized AMF dealers but found no violation of the decree. The court observed that to hold defendants responsible for the packaging and labelling practices of AMF distributors would effectively require them to monitor the relationship between distributors and their customers, an obligation that the decree failed to impose on defendants directly. As to an alleged violation of paragraph 1(f), the district court emphasized that the "purchasers," as that term is used in the decree, were the dealers, not the eventual downstream recipients. So long as the dealers knew they were receiving non-AMF products, and the court found no evidence that they were misled by Walchem's practices, defendants were not "passing off" their products in contravention of paragraph 1(f).

We cannot say that the district court committed clear error in not finding a violation of the decree. The evidence was conflicting as to the extent of Walchem's knowledge of the dealers' substitution of Walchem products for those of AMF; and it would be necessary, in any event to reach beyond the strict terms of the decree to find Walchem in violation. Just as we do not think a court can ignore obvious violations, it need not reach out for an expansive interpretation. We sustain the district court on this issue.

### 4. *Name Change Notices*

AMF alleges error in the district court's refusal to uphold its claim of contempt based on defendants' practice of appending a Walchem sticker and the notation "Note our new name" when sending back customer queries that incorrectly addressed Walchem as Precision Control Products.

AMF argues that these responses falsely implied that Walchem was once named Precision Control Products whereas in fact Precision Control Products was the company Jewett sold to AMF in 1973. AMF claims that it had succeeded to all rights in that and other aspects of the Precision name. AMF contends that Walchem's practice vio-

lated paragraph 1(b) of the consent decree because it improperly made use of the Precision name in connection with the sale of chemical metering pumps. To bolster its position, AMF points to paragraph 1(b)(iii), which prescribes an explicit form for name-change notices and limits Walchem's use of such notices to the period ending December 31, 1977.

The district court concluded that this conduct did not violate the decree. It observed that the insert prescribed in Exhibit B of the decree was intended to reduce purchaser confusion concerning Walchem's relationship to AMF Precision. That Walchem had continued to receive correspondence addressed to Precision indicated to the court that this procedure had proved inadequate. Thus, the court concluded that the decree implicitly authorized some continuing efforts on Walchem's part to inform customers that its name had been changed.

While the issue is close, we do not find reversible error. It would be unreasonable to regard the name-change notices approved in paragraph 1(b) as the only ones allowed. Walchem was entitled and indeed expected to eliminate confusion by notifying customers appropriately of its new name. As in the cases of the Western Union and telephone listings, it was improper not to do so. AMF's attorneys were themselves concerned, when deposing Jewett, as to whether he had taken steps to tell customers that Walchem was no longer associated with Precision.

It is true that Walchem was less than candid in implying, to the extent it did, that it rather than AMF might be the *successor* to Precision. But we cannot say the district court exceeded its authority in refusing to find that what was done in these narrow circumstances violated paragraph 1(b).

5. *Sales of Hybrid Pumps in "AMF CUNO" Boxes Packed with AMF Literature*

 AMF appeals from the lower court's refusal to hold defendants in contempt for selling so-called hybrid pumps to customers in "AMF CUNO" boxes.

Defendants' practice in filling certain orders was to purchase an AMF Precision pump in its original box, to replace the AMF Precision "liquid end" with a Walchem liquid end, and to ship the resulting "hybrid" pump to a customer in its original "AMF CUNO" box. Walchem's service personnel taped over AMF's address on the outside of the box, but they did not cover the marks AMF and CUNO. Labels were attached to the hybrid pumps indicating that Walchem sold and serviced metering pumps and that the pumps had been serviced or rebuilt to correspond to a particular model of the AMF line of pumps. Defendants packed the carton with the AMF Cuno instruction booklet that had accompanied the original pump plus a Walchem parts list and instruction sheet.

AMF contends that this practice violated paragraph 1(b) which prohibits defendants from

> applying to or using in connection with the sale, advertisement or distribution of chemical metering pumps or related components ... words so similar to ... any of plaintiff's other trademarks, i.e., ... "AMF" and "CUNO" as to be likely to cause confusion or mistake or to deceive or to be likely to cause dilution of the distinctive quality of plaintiff's said trademarks and tradenames ....

In finding no violation, the district court ruled that the decree permitted defendants to sell new hybrid pumps composed partly of AMF components. It inferred this from the absence of any prohibition in the decree against such sale, and from paragraph 1(d) and Exhibit D which permitted defendants to apply to the housing of products originally manufactured by plaintiff (AMF) a label of the following description:

WALTHAM Chemical Pump Corp.
1396 Main St., Waltham, MA. 02154

———————————

Serviced or Rebuilt to correspond to
AMF Model No. ———————————
Serial No. ———————————————
Volts ——— HZ ——— Amps ———

The court interpreted use of the term "rebuilt" in the above as suggesting "that defendants are permitted to sell new modified (hybrid) pumps, not just old pumps serviced with AMF parts." This being so, the court construed paragraph 1(b) as not prohibiting use of the terms "AMF," "CUNO" and "Precision Control Products" to describe "those parts of a hybrid pump which originate with AMF." The court noted AMF's "strong concerns" about defendants' "passing off" of its products as their own, and went on to say,

> The fact that the decree expressly permits defendants to continue selling and servicing AMF products, along with plaintiff's strong concerns about "passing off" strongly suggest that defendants are expected to go out of their way to insure that AMF products are labelled as such.

The court found additional support for its construction in paragraphs 1(c) and 1(g) of the decree. Paragraph 1(c) forbids defendants from "labelling or packaging AMF products so as to appear to have been manufactured by" them, provided they may affix their own label clearly indicating "sales or service, but not manufacture," in the form set forth in Exhibit C. Paragraph 1(g) prohibits defendants from packaging or labelling any AMF product so that plaintiff's model or part number is used in conjunction with defendants' name, so as to suggest defendants were the manufacturer or source of origin of the products.

In light of the above, and of the wording of paragraph 1(b) itself, the court held that paragraph 1(b) was simply meant to eliminate confusion as to the nature of Walchem—that is, to make clear it was no longer connected with AMF or Precision Control Products—not to prevent defendants from identifying the origin of AMF pumps and parts. And the court construed paragraph 1(b) as prohibiting use of plaintiff's marks only insofar as they were likely to cause confusion or mistake, or to deceive purchasers. It found that defendants' prac-

tices with respect to hybrid pumps created no such confusion.

We do not agree that the decree allows the marketing of hybrid pumps in AMF/CUNO boxes and with AMF/CUNO instruction manuals. Paragraph 1(b) prohibits use of plaintiff's trademarks, including AMF and CUNO, in connection with the sale or distribution of metering pumps or components.[4] The district court erred, in our view, in construing the decree to prohibit use of those marks "only insofar as they are likely to cause confusion or mistake, or to deceive purchasers or potential purchasers." And even were this so, it is hard to see why shipment of a hybrid pump in an AMF carton in this manner would *not* create a likelihood of confusion or mistake as to the source of the product and its components. The district court justified the practice on the ground that defendants were entitled to identify "those parts of a hybrid pump which originate with AMF," but packaging the entire hybrid in a single AMF carton was hardly calculated to identify just those parts which came from AMF.

The practice, moreover, is not sanctioned in any exception to the broad strictures of paragraph 1(b). Paragraph 6 allows defendants to sell "new products of plaintiff," but requires that they be "shipped in their original containers and with their original labels." Clearly it would be an unrealistic and strained reading of this provision to hold that it authorized defendants to open the original container, tamper with the AMF product therein, add a new non-AMF part and resell the newly constituted hybrid in the original AMF container.

To be sure, paragraph 1(c)—which forbids "passing off" plaintiff's products by mislabelling them, so as to make them appear to have been manufactured by defendants— allows defendants to affix a label clearly indicating "sale or service but not manufacture of said products by said defendants." And paragraph 1(d)—which forbids use of

---

4. While paragraph 1(b) speaks literally only of prohibiting use of words *so similar to* the marks "AMF" and "CUNO" as to be likely to cause confusion or mistake or deceive, etc., we have already held, in section 2, above, that the provision a fortiori prohibits use of the very trademarks themselves.

plaintiff's model numbers on products not manufactured by plaintiff—allows defendants to use plaintiff's model numbers "in the space indicated in a label in the form annexed hereto as Exhibit D applied to the housing of products originally manufactured by plaintiff whether or not those products contain components not supplied by plaintiff." Exhibit D, already described, is a label indicating the pump was "Serviced or Rebuilt to correspond to AMF Model No. ____." But these labels are most reasonably explained as contemplating that defendants would engage in sales and service, including rebuilding of used pumps. There is nothing in the decree to suggest that defendants were being authorized to construct modified pumps out of a mixture of new AMF and Walchem components, and then sell them as new pumps in AMF cartons but with labels indicating they had been rebuilt by defendants. To the contrary, the limitations in paragraph 6, and the language in paragraphs 1(c) and (g) prohibiting defendants from holding themselves out as "manufacturer" or "source of origin" of AMF products, all tend to militate against such a practice. And paragraph 1(b), as noted, broadly prohibits the use of the AMF/CUNO marks in connection with the sale of any metering pumps—subject only to the exceptions noted. As the obvious purpose of the decree is to prevent defendants from misappropriating plaintiff's trademarks and confusing the public as to the source of products, one would expect clear authorization in the decree before implying an exception for a practice of this sort.

In normal parlance, moreover, the term "rebuilt" refers to a used product that has been reconditioned with new or used parts or components. Use of the term here, in conjunction with the term "serviced" (and in a decree limiting defendants to sales and service of AMF products, but not manufacture), strengthens that construction. Had that part of the decree been intended to

license the manufacture and sale of a line of new, modified "hybrid" pumps packaged under one of AMF's trade names, it could have said so. The single reference to a rebuilt pump in Exhibit D, allied as it was with defendants' servicing role, is not enough to have created an exception to the broad prohibition contained in paragraph 1(b).[5]

Moreover, defendants' labelling and packaging practices here were inappropriate. Defendants were obliged to eliminate as much as possible any prospect of customer confusion. They contend that the carton in which these pumps were shipped truthfully advised the recipient that an AMF product was to be found inside as required in paragraphs 1(c) and 1(g). But the carton nowhere explained its contents in a manner that would adequately inform a customer that the pump was composed of both AMF and Walchem components. Rather, the box bore the terms "AMF, CUNO" and Walchem's address label, packaging hardly calculated to inform customers that the product inside was a hybrid much less to distinguish Walchem from AMF—a prime objective of the decree.

We hold that the district court erred in ruling that defendants' above-described practice in regard to hybrid pumps was not violative of the consent decree.

6. *Walchem's Use of AMF Model Numbers*

AMF argues that the district court erred in concluding that the decree did not prohibit Walchem from using AMF Precision model numbers to describe chemical metering pumps. Paragraph 1(d) of the decree prohibits defendants from,

> using any model number identical to a model number of plaintiff's or confusingly similar thereto so as to be likely to cause confusion or mistake or to deceive or to cause dilution of the distinctive quality of said model number to describe any product which is not manufactured by plaintiff or any product originally

---

5. Plaintiff's counsel took the position during his opening argument below that Exhibit D was inserted into the decree to accommodate Jewett's concern that AMF labels on used pumps

were often obscured by wear. Defendants did not to our knowledge dispute plaintiff's assertion as to the negotiating history of Exhibit D.

manufactured by plaintiff but containing parts or components not manufactured by plaintiff.

AMF argues initially that Walchem violated this provision by listing AMF model numbers in its catalog and filling customer orders for such models with Walchem hybrid pumps. When coupled with the catalog listings, this practice of substituting Walchem pumps resulted, AMF contends, in the use of AMF model numbers to describe a product that, at the time of shipping, was not a genuine Precision pump. AMF characterizes this substitution practice as a bait and switch operation in which Walchem induced customers to order genuine AMF products with the AMF model numbers and then filled the resulting orders with hybrid pumps. AMF also contends that Walchem used model numbers to describe its own brand of pumps that were confusingly similar to the numbers used by AMF.

The district court found no violation. Addressing AMF's first argument, the court explained that paragraph 6 authorized defendants to sell genuine AMF products and that paragraph 1(d) authorized the use of AMF model numbers to describe such products. Thus, the catalog listings in themselves did not violate the decree. The court acknowledged that on occasion Walchem would substitute its own hybrid pumps, but it declined to link these shipments of Walchem products to the catalog listings. Certain substitution practices, the court reasoned, were expressly authorized by a proviso in paragraph 1(f); thus, defendants were not using AMF model numbers to "describe" non-AMF products by listing the Precision pumps in the catalog and substituting hybrid pumps.

■ We would agree with the district court that insofar as defendants' substitution practices were occasional or isolated, the use of AMF model numbers to describe AMF products did not violate the decree. Defendants stocked a quantity of AMF products with which to fill orders for Precision pumps, but they conceded that on occasion they filled orders for AMF pumps with Walchem hybrid pumps. Walchem's service

representative, Mr. Presseau, estimated in his affidavit that the rate of substitution ranged from as low as five percent for the most frequently sold AMF models to as high as thirty percent for other models. With respect to models where substitutions of only this frequency were shown we believe the district court was entitled to find that the AMF model numbers in the catalog were not being used to describe products other than those manufactured by plaintiff.

Where substitutions took place routinely, however, the use of AMF model numbers in the catalog violated the decree because the numbers did not describe AMF products. Presseau indicated that AMF code "07" and "21" liquid handling ends were not generally available to Walchem. This statement by Walchem's employee suggests that when a customer ordered an AMF pump with an "07" or "21" liquid end, Walchem frequently and perhaps typically substituted a hybrid pump.

■ We also disagree with the district court's conclusion that the model numbers used by Walchem to describe its own pumps were not confusingly similar to their AMF counterparts. A typical AMF model number consists of five elements, each of which describes a separate feature of the pump. The first element, the "series" number, describes the drive assembly component of the pump. AMF series numbers range from "H1000" to "H5000" and from "6000" to "15,000," varying in increments of 1,000. Thus, the drive assembly in an "8000" series pump differs from that in a "9000" series pump. The second element of the system, a two-digit number, describes the liquid handling end, which, together with the drive assembly, makes up the pump. As an illustration, consider the AMF model number "8311–11." The digit "8" identifies the drive assembly as part of the "8000" series. The second two digits, "31," identify the liquid handling end as an AMF code "31" component. The final three digits describe other features of the pump. The digit "1" at the end of the "8311" identifies the pump as a single-headed pump, in contrast to a double-headed pump, in which case the last

digit would be a "2." The first digit of the "–11" indicates the speed of the pump—"1" signifying a low and "2" signifying a high-speed pump. The second digit of the "–11," "1," indicates 115 volts; a "2" would indicate 230 volts.

Walchem adopted a similar five-element numbering system to describe its hybrid pumps. The Walchem system was identical to the AMF system except that Walchem described its own liquid handling ends with two-digit codes that differed from their AMF counterparts. Walchem's catalog, for example, lists a model "8481–11" metering pump. This pump consists of an "8000" series AMF drive assembly and a code "48" Walchem liquid handling end; the final three digits convey the same information as the corresponding digits in an AMF model number. Walchem's catalog groups AMF pumps together with Walchem pumps and displays them under a common heading according to the "series" of the drive assembly. For example, an AMF model "9211–11" is listed directly above a Walchem model "9451–11" and both pumps are grouped under the heading "9000 Series." Thus, in scanning down the list of pumps in Walchem's catalog, the only way to distinguish AMF pumps from Walchem pumps is to determine whether the liquid handling end code refers to an AMF or a Walchem product.

The district court concluded that the model numbers Walchem used to describe its hybrid pumps were not confusingly similar to those of AMF. Characterizing the defendants' system as "legitimate and useful," the court observed that the use of different codes to describe Walchem's liquid ends would alert customers that the pumps listed under Walchem's numbers had not been produced by AMF. In the court's view, any purchaser sophisticated enough to rely solely on Walchem's numbering system in ordering pumps would understand the meaning of the system. Other less experienced customers would find the model numbers completely unilluminating and would not base a decision to purchase an expensive pump on the model number alone.

The court's conclusion assumes, incorrectly we think, that speculation as to the sophistication of some customers precluded a finding of confusion where, as here, the two numbering systems were virtually identical. The universe of prospective purchasers cannot be neatly divided into those whose familiarity with the AMF numbering system enables them to distinguish AMF model numbers from Walchem numbers and those whose ignorance prevents them from referring to model numbers altogether. The evidence suggested that Walchem distributed its catalogs to over 100 customers; it can hardly be assumed that each recipient fell squarely into one of the two camps. The simple fact that Walchem's numbering system—by incorporating AMF's series number, by using a two-digit number to describe liquid ends, and by using the last three digits to convey information concerning the speed and voltage of the pump—was effectively identical to AMF's numbering system compelled a finding of likely confusion and a conclusion that the use of such numbers violated the decree. We hold that the district court erred insofar as it found Walchem free from contempt with respect to use of its numbering system.

### 7. Walchem's Use of AMF Part Numbers

AMF argues that the district court erred in upholding defendants' practice of listing parts obtained from non-AMF sources as substitutes for AMF Precision parts. Paragraph 1(e) of the decree prohibits defendants "from describing or marking any replacement part for plaintiff's products not manufactured by plaintiff by any designation other than the substitute part number shown in the List of Substitute Part Numbers." The List of Substitute Part Numbers adverted to in the decree was compiled by AMF and delivered to defendants shortly after the decree was entered; it lists every AMF part number and a corresponding Walchem number for each such part. Thus, paragraph 1(e) by its terms prohibits Walchem from "describing or marking" replacement parts by any designation other

than the Walchem numbers provided in the List of Substitute Part Numbers.

AMF argues that the listings in Walchem's catalogs, price lists, and invoices violate paragraph 1(e) because AMF part numbers are used to "describe" the Walchem part. AMF points, for illustrative purposes, to the parts price list in Walchem's catalog which lists Walchem parts under the heading "Walchem Part No." Adjacent to the Walchem number, the catalog listed the AMF Precision part number under the heading "Replaces Part No." By explicitly representing the Walchem part to be a replacement for its Precision counterpart, AMF argues, defendants were "describing or marking" the part in violation of the decree.

The district court determined that paragraph 1(e) does not clearly prohibit Walchem from including a "cross-reference" to the corresponding AMF part. Such cross-references, the court reasoned, did not suggest that the parts are identical but only that Walchem's parts substitute for or replace those of AMF. The court concluded that the cross-references do not further purchaser confusion as to the origin of the part but rather help purchasers identify the part they seek to buy.

■■■ We agree with the district court that paragraph 1(e) does not clearly prohibit the use of AMF part numbers as cross-references. To begin with, paragraph 1(e) does not—as it might have—prohibit all use of AMF parts numbers but only the use of the numbers to "describe or mark" Walchem's products. Thus the provision differs from paragraphs 1(a) and 1(b) which flatly proscribe use of the AMF trademarks listed. We find this distinction important in view of the fact that paragraph 1(e) was plainly intended, as AMF has admitted, to authorize Walchem to sell replacement parts. It is difficult to imagine Walchem selling replacement parts without referring in advertisements or invoices to the AMF part number to be replaced. The more sensible interpretation of paragraph 1(e)—and the one the district court adopted—is that it prohibits Walchem from describing replacement

parts in a manner that confusingly suggests that the parts were produced by AMF. The testimony of William Reilly, the executive in charge of AMF Precision, implicitly supports this interpretation. He testified that he had learned, during the period when the consent decree was originally negotiated, that Walchem had been passing off its own parts under AMF labels. This concern with passing off suggests that paragraph 1(e) was intended to prevent Walchem from unfairly labelling its parts so as to mislead purchasers as to their origin. We therefore find no error in the district court's conclusion that the defendants did not violate the decree in listing their parts as substitutes for those of AMF.

### 8. *Walchem's Substitution Practices*

■■■ AMF argues that the district court incorrectly interpreted paragraph 1(f) to permit defendants to ship Walchem products to customers who had ordered genuine Precision products without first obtaining the purchaser's consent to the substitution. Paragraph 1(f) prohibits defendants

> from filling any order for a product described in any way by reference to, or use of the words, "DIATON," "SENTROL," "AMF," or "PRECISION," either alone or in combination with other words, or by reference to plaintiff's part number or model number for the desired product, except with new products manufactured by plaintiff, unless the purchaser changes the order orally or in writing.

Walchem's practice under this provision has evolved in the years since the decree was entered. Initially, upon receiving an order referring to Precision parts, models, or trademarks, Walchem's customer service representatives telephoned the customer, explained that they proposed to ship non-AMF goods, and obtained the customer's consent to the substitution. In mid-1978, citing the expense and delay associated with this procedure, Walchem adopted instead what the parties have referred to as an "acknowledgement procedure." From the date of its adoption in July 1978 until defendants altered the practice in 1980 at

AMF's insistence, Walchem's customer service representatives *no longer* telephoned the customer to obtain his consent to the substitution. Instead, a Walchem employee would photocopy the order form, indicate in writing that he planned to substitute Walchem products for one or more of the AMF products that had been ordered, and send this notice of substitution to the customer. The goods were shipped without waiting for the customer to respond, often within a few days. There was no practice of waiting for or seeking the customer's oral or written approval of the substitution. Walchem treated acceptance and payment for the goods as sufficient change of the original order.

The district court found that the "acknowledgement procedure" did not violate the decree. The court first emphasized the provision's ambiguity, stating that it "does not, as it might have, specify that defendants must obtain the required consent before filling their orders, or that orders are 'filled' upon shipment." The court went on to observe that the more logical interpretation, the one suggested by Walchem, "is that an order is not 'filled' until the purchaser accepts delivery of it, particularly if it has not yet been paid for." Finally, the court observed that AMF had produced no evidence of customer dissatisfaction or deception.

We agree with AMF that the district court erred in adopting Walchem's interpretation of the word "filled" and in refusing to find that the procedure used violated the decree. There is no support for the district court's conclusion that ambiguity surrounded the meaning of the word "filled." To the contrary, we think paragraph 1(f) can only sensibly be interpreted, as AMF contends, to prohibit substitutions unless consent is manifested prior to shipment of the substitute. Paragraph 1(f) was intended, as the parties agree, to prohibit defendants from passing off non-AMF goods as genuine AMF Precision products. This prohibition loses its force if it is construed to permit Walchem to ship nonconforming goods without having secured the customers' consent. The provision contains no

qualifying language and the absence of any evidence of customer dissatisfaction is irrelevant.

## CONCLUSION

We conclude that the district court erred in holding defendants free from contempt in connection with the practices discussed in subsections (1), (2), (5), (6) (except as indicated therein), and (8) of section III. The judgment below is reversed in all such instances, and the case is remanded with directions to enter findings of contempt as to each such matter and for further proceedings not inconsistent herewith, including assessment of any appropriate damages. The judgment is otherwise affirmed as to the practices considered in subsections (3), (4), and (7) of section III.

*Reversed in part, affirmed in part and remanded.*

## APPENDIX

United States District Court

District of Massachusetts

Civil Action No. 77–1411–F

AMF Incorporated, Plaintiff,

vs.

Raymond L. Jewett, Precision Chemical Pump Corporation and Liquid Metronics, Inc., Defendants.

### CONSENT DECREE

IT IS HEREBY ORDERED, DECREED AND ADJUDICATED:

1. That defendants Precision Chemical Pump Corporation (now known as Waltham Chemical Pump Corporation) and Raymond L. Jewett and their agents, servants, employees and all persons in active concert or participation with them, or any of them, be permanently enjoined and restrained:

(a) from using upon or in connection with the sale, advertisement or distribution of any chemical metering pumps or related components the notation "PCP" in any shape or form and from using any other

notation or label so similar to plaintiff's registered trademark "PCP" (U.S.Reg. No. 713,473) as to be likely to cause confusion or mistake or to deceive or to be likely to cause dilution of the distinctive quality of plaintiff's said trademark or to cause injury to plaintiff's reputation;

(b) from applying to or using in connection with the sale, advertisement or distribution of chemical metering pumps or related components the notation "Precision" or "Precision Chemical Pump Corporation" or any other words so similar to either of plaintiff's trademarks, tradenames or service marks "Precision" and "Precision Control Products" or any of plaintiff's other trademarks, i.e., "SENTROL", "DIATON", "AMF" and "CUNO", as to be likely to cause confusion or mistake or to deceive or to be likely to cause dilution of the distinctive quality of plaintiff's said trademarks and tradenames or to cause injury to plaintiff's reputation, provided, however, that (i) prior to November 1, 1977, said defendants may use their pre-existing printed material bearing the name "Precision Chemical Pump Corporation" described in Exhibit A hereto, so long as the name "Precision Chemical Pump Corporation" is totally covered in the manner set forth in Exhibit A, (ii) prior to September 30, 1977, defendants may use the name "Precision Chemical Pump Corporation" in a written notification to the trade of the change of name required by this consent decree, but only in the form annexed hereto as Exhibit B, (iii) prior to December 31, 1977, defendants may use such name in the form annexed hereto as Exhibit B as an insert in individual mailings or shipments, and (iv) defendant Precision Chemical Pump Corporation may request the New England Telephone Company to have its directory assistance operators respond to requests for the telephone number of Precision Chemical Pump Corporation with the information that the name of that company has been changed to Waltham Chemical Pump Corporation and its telephone number is (617) 899–8604 until August 30, 1978;

(c) from removing plaintiff's original label from any of plaintiff's products or installing any label in the location of plaintiff's original data plate label, or otherwise labeling or packaging any of plaintiff's products as to appear to have been manufactured by said defendants, provided, however, that defendants may affix an additional label which does not obscure plaintiff's label and which clearly indicates sale or service but not manufacture of said products by said defendants in the form attached hereto as Exhibit C;

(d) from using any model number identical to a model number of plaintiff or confusingly similar thereto so as to be likely to cause confusion or mistake or to deceive or to cause dilution of the distinctive quality of said model number to describe any product which is not manufactured by plaintiff or any product originally manufactured by plaintiff but containing parts or components not manufactured by plaintiff, provided, however, that defendants may use plaintiff's model numbers in the space indicated on a label in the form annexed hereto as Exhibit D applied to the housing of products originally manufactured by plaintiff whether or not those products contain components not supplied by plaintiff, but at a location other than that originally occupied by plaintiff's data plate label;

(e) on or after a date three weeks subsequent to the delivery to defendant by plaintiff of a "List of Substitute Part Numbers" consisting of a list of all of plaintiff's part numbers with a corresponding substitute number for each, which list shall be delivered not later than September 23, 1977, from describing or marking any replacement part for plaintiff's products not manufactured by plaintiff by any designation other than (i), the substitute part number shown in the "List of Substitute Part Numbers" to correspond to plaintiff's part number for the particular replacement part as listed in plaintiff's product bulletins or (ii) in the case of a replacement part for which plaintiff's part number is not listed in the aforesaid list, a designation which is not similar to and not likely to be confused with and which does not in any way incorporate any of plaintiff's part numbers contained in

said list which are for an equivalent or nearly equivalent replacement part, provided, however, that defendants may sell existing stocks of replacement parts not manufactured by plaintiff but marked with part numbers not in accordance with (i) and (ii) above so long as said parts are also marked with, and otherwise described only by, reference to a part number permitted by (i) or (ii) above, and, provided further, however, that plaintiff, in the event of a reasonable objection made by defendants at any time to any specific substitute number, shall designate another substitute number satisfying the reasonable objection.

(f) from filling any order for a product described in any way by reference to, or use of the words, "DIATON", "SENTROL", "AMF", or "PRECISION", either alone or in combination with other words, or by reference to plaintiff's part number or model number for the desired product, except with new products manufactured by plaintiff, unless the purchaser changes the order orally or in writing.

(g) from packaging or labeling any product of plaintiff so that plaintiff's model number or part number is used in conjunction with any name of either defendant in such a manner as to suggest that either defendant is the manufacturer or source of origin of products with such a model number or part number;

(h) from using the Waltham telephone number (617) 894–0399.

2. That to the extent that defendants Precision Chemical Pump Corporation and Raymond L. Jewett have not already done so, they are ordered to immediately deliver up to plaintiff for destruction all labels, signs, prints, packages, wrappers, receptacles, advertisements, stationery, forms and other written or printed material in the possession or control of defendants which bear the notations "PCP", "Precision", "Precision Control Products" or "Precision Chemical Pump Corporation" or which bear any other simulation of the foregoing trademarks and tradenames, or of plaintiff's registered trademarks "SENTROL", "DIATON", "AMF" and "CUNO", or which bear

any other representation or statement in violation of the injunction issued hereby and that the said defendants are further ordered, to the extent they have not already done so, to deliver up to plaintiff for destruction all plates, molds, matrices and other means of making the aforesaid written or printed material; provided, however, that defendants may retain the pre-existing printed material bearing the name "Precision Chemical Pump Corporation" described in Exhibit A hereto for the uses permitted by paragraph 1(b) of this consent decree.

3. That defendant Precision Chemical Pump Corporation shall change its name so that, effective not later than the date of entry of this consent decree, it does not incorporate the word "Precision".

4. That defendant Precision Chemical Pump Corporation shall immediately execute and deliver to plaintiff a letter addressed to the New England Telephone Company in the form annexed hereto as Exhibit E.

5. That (a) on or before September 16, 1977, defendants shall deliver freight prepaid to plaintiff (in Meriden, Connecticut) every new product manufactured by plaintiff now in their inventory which is missing plaintiff's data plate label, for the purpose of plaintiff's attaching new data plate labels to said products and on or before September 12, 1977, defendants shall provide plaintiff with a list of said products; and plaintiff shall return said products to defendants within three working days via collect freight; and

(b) defendants shall not request that any order for products manufactured by plaintiff placed with any supplier thereof be filled with products without the original data plate labels.

6. That nothing in this consent decree shall prohibit defendants from selling new products of plaintiff shipped in their original containers and with their original labels or from using bulletins and other literature provided by plaintiff in connection with the sale of new products manufactured by plaintiff, so long as said bulletins or other

literature are not mutilated and no additional writings or labels are placed thereon in such a manner as to cover plaintiff's name, address or trademarks or to suggest that any defendant is an authorized distributor of plaintiff's products.

7. That defendants Precision Chemical Pump Corporation and Raymond L. Jewett are ordered to file with this Court and to serve upon the plaintiff within sixty (60) days after entry of this consent decree a statement under oath setting forth in detail the manner and form in which said defendants have complied with paragraphs 1 through 5 of this consent decree.

8. That defendants shall pay to the plaintiff the amount of $100,000, for which sum each of the defendants shall be jointly and severally liable, and which sum shall be paid as follows: $30,000 by September 30, 1977; $20,000 by December 31, 1977, and $10,000 by each December 31, in the years 1978, 1979, 1980, 1981 and 1982.

9. That the complaint in this action and all claims contained therein are dismissed with prejudice as against all defendants, each party bearing its own costs. This dismissal is subject to the terms of paragraph 11 hereof.

10. That plaintiff and defendants shall exchange mutual releases from all claims now or heretofore existing between them, except claims relating to this consent decree or to any obligation relating to taxes arising under Article III or Article VIII of the agreement made as of the 29th day of May, 1973 between AMF Incorporated, Raymond L. Jewett and Clifford B. Moller.

11. That this Court shall retain jurisdiction of this case for the purposes of effectuating the terms and conditions of the foregoing consent decree.

Dated: Boston, Massachusetts
September 15, 1977

/s/ Frank M. Freedman
U.S.D.J.