# United States Court of Appeals
## For the First Circuit

---

Nos. 99-1710, 99-1711

ACCUSOFT CORPORATION,

Plaintiff, Appellant\Cross-Appellee,

v.

JAMES L. PALO; SIMON WEICZNER;
INDIVIDUALLY AND D/B/A SNOWBOUND SOFTWARE,

Defendants, Appellees\Cross-Appellants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

---

Before

Selya, Circuit Judge,

Bownes, Senior Circuit Judge,

and Stahl, Circuit Judge.

---

Barry A. Bachrach and Louis M. Ciavarra, with whom Bowditch & Dewey, LLP, was on brief for appellant.
Richard C. Heidlage, with whom Prince, Lobel & Tye, LLP, William S. Strong, and Kotin, Crabtree & Strong, LLP, were on brief for appellees.

January 19, 2001

**STAHL,** <u>Circuit Judge</u>.  Plaintiff-appellant AccuSoft Corporation ("AccuSoft") and Defendants-appellees James Palo, Simon Wieczner and Snowbound Software appeal from the district court's rulings on cross-petitions for civil contempt arising out of alleged breaches of a 1996 settlement agreement establishing their respective rights in a piece of computer software.  The district court, adopting the conclusions of a special master, agreed with AccuSoft that the Defendants breached the settlement agreement, awarding AccuSoft $149,000 in attorneys' fees, but no damages, while finding in Defendants' favor with respect to $178,000 in unpaid royalties they claimed were owed under the agreement.  For the reasons discussed below, we affirm in part and reverse in part.

I.

Plaintiff AccuSoft is a corporation engaged in the image processing software business.  Defendants Palo and Wieczner are former associates of AccuSoft and the current owners of Snowbound Software ("Snowbound"), a corporation that competes with AccuSoft in the image processing software market. The events relevant to this appeal began in 1992 when Palo, a software designer and developer, was engaged by AccuSoft to

develop a library or toolkit of software routines for manipulating computer images. Pursuant to a contract with AccuSoft, Palo agreed to provide the software product to AccuSoft, along with an exclusive right to distribute it for one year, in return for a percentage of the sales revenue. AccuSoft and Palo subsequently extended this agreement and made it automatically renewable for additional one-year periods.

The software developed by Palo was brought to market by AccuSoft in 1992 as the Image Format Library ("IFL") and became AccuSoft's principal product. In 1993, Wieczner was hired by AccuSoft to direct the sales and marketing program for the IFL. AccuSoft's and Wieczner's efforts to market the IFL were apparently successful; by 1995, the IFL had a significant share of the relevant market and produced gross revenues totaling $3.2 million.

Despite this success, AccuSoft's relationship with Palo and Wieczner began to deteriorate during 1995. By January 1996, both Palo and Wieczner had terminated their association with AccuSoft. Subsequently, Palo notified AccuSoft of his intent to end his licensing agreement with AccuSoft, effective January 31, 1996. On January 22, 1996, Palo registered a copyright for the IFL in his name with the United States Copyright Office. Shortly thereafter, Palo and Wieczner founded their own company,

Snowbound Software, and offered for sale a product called the RasterMaster Library which, they acknowledge, was essentially the same as the version of IFL then being marketed by AccuSoft. In February 1996, AccuSoft also registered a copyright for the IFL software.[1]

On March 5, 1996, AccuSoft filed a complaint in the United States District Court for the District of Massachusetts against Palo, Wieczner and Snowbound alleging, inter alia, copyright infringement, breach of contract and misappropriation of proprietary information. The same day, Palo also filed a complaint in the United States District Court for the District of Massachusetts against AccuSoft and Scott Warner, AccuSoft's president and founder, asserting similar claims. Each party subsequently moved for a preliminary injunction prohibiting the other from using or selling the disputed software and from making public statements concerning their ownership of the IFL. The two actions were consolidated before Judge Gorton on April 24, 1996.

---

[1] The fact that both parties were able to register copyrights in the IFL software -- an element of the background which we draw from Judge Gorton's opinion -- strikes us as unusual and we find nothing in the record of the present case to explain how this occurred. However, it does not appear to bear directly on the issues presented by these appeals.

In a published ruling on the motions for injunctive relief, AccuSoft Corp. v. Palo, 923 F. Supp. 290 (D. Mass. 1996), the district court concluded that Palo was likely to succeed on his claim that he was the author of most or all of the code contained in the IFL, and thus the rightful copyright owner. However, Judge Gorton found that AccuSoft would likely succeed in demonstrating that the agreement between AccuSoft and Palo transferred to AccuSoft an exclusive right to distribute products derived from the codes and that this right could be terminated only by mutual consent of the parties. Based on these findings, Judge Gorton issued a preliminary injunction which effectively prohibited either company from distributing its product and barred all parties from making public statements concerning ownership of the software until the trial on the merits.

It was in this context that the parties, on the eve of trial, signed a confidential agreement settling the case. The agreement was filed under seal and was approved and incorporated into an order of the district court dated June 7, 1996. The agreement sought to establish the respective rights of the parties in the IFL code, providing generally for a transfer of those rights to Palo/Snowbound but allowing AccuSoft to continue to license the IFL through August 31, 1996 at specified royalty

rates. During this transitional period, it was AccuSoft's intent to finish developing and begin marketing a replacement product, dubbed "ImageGear," which was not based on the IFL code. The settlement agreement also set forth detailed requirements concerning the public statements that could be made by the parties with respect to ownership of the IFL, established certain requirements for record-keeping, and allowed Palo access to AccuSoft's records for the purpose of conducting audits to determine whether appropriate royalty payments were being paid. Pursuant to the order, the court retained jurisdiction to enforce the agreement's terms.

Less than two months later, on July 30, 1996, AccuSoft filed a motion for contempt in the district court, alleging numerous violations of the settlement agreement's public disclosure and confidentiality provisions by Palo, Wieczner and Snowbound (referred to hereafter collectively as "Snowbound"). As relief for Snowbound's alleged contempt, AccuSoft sought an order directing Snowbound to comply with the agreement, a determination that AccuSoft was excused from making future royalty payments under the agreement as a result of Snowbound's breach, and an unspecified monetary penalty. Snowbound subsequently filed a cross-motion for contempt, alleging non-payment of royalties due under the agreement, violations of the

agreement's public disclosure provisions, and non-compliance with the agreement's requirements regarding record-keeping and the form of licenses that AccuSoft could issue.

By order of reference dated August 16, 1996, Judge Gorton referred the contempt motions and "related motions" arising out of the same dispute to special master Michael Keating. Nearly two years of proceedings before the master ensued, during which the master held evidentiary hearings, arranged for an outside audit of AccuSoft's books by Richard L. Eisner & Co., LLP ("Eisner")[2] to determine AccuSoft's compliance with royalty obligations, and responded to a steady stream of interlocutory motions emanating from both parties.

The master's conclusions concerning the matters referred to him were subsequently set forth in a series of memoranda. The first such memorandum concerned the dispute over royalties owed by AccuSoft to Snowbound for licensing of the IFL, referred to by the parties as the "audit phase" of the case. Based on testimony from the parties and from the master's

---

[2]      Prior to the master's involvement, Palo engaged Newburg & Company, LLP ("Newburg") to conduct an audit pursuant to the settlement agreement. According to Snowbound, Newburg had significant difficulty obtaining the information it sought from AccuSoft, although a report summarizing Newburg's findings was completed and submitted to Snowbound in November, 1996. AccuSoft apparently disputed the conclusions of the Newburg audit.

independent auditor, the master concluded that Accusoft had failed in a number of instances to pay royalties owed under the agreement, by a total amount later determined to be $178,000, exclusive of interest.[3] At the same time, the master concluded that the terms of the settlement agreement precluded Snowbound from collecting other royalty sums it believed it was owed.

The remaining substantive allegations in the contempt petitions were disposed of in a second memorandum. Here, the master rejected all of Snowbound's allegations of contemptuous conduct by AccuSoft, generally finding that although AccuSoft had at times engaged in "sharp practices" in an effort to maximize its benefits under the settlement agreement, its actions were not prohibited by the agreement with sufficient specificity to support a finding of civil contempt. By contrast, the master found that many public statements made by Snowbound in the period immediately following settlement were sufficiently clear violations of the agreement's terms to constitute contempt. Nonetheless, the master declined to provide the relief AccuSoft requested, finding: (1) that AccuSoft had adduced no grounds justifying rescission of the agreement or otherwise excusing AccuSoft from its obligation to

_____

[3]     The master calculated the interest, as of May 31, 1998, to be approximately $40,000.

-8-

pay royalties after the date of Snowbound's breaches of the agreement; and (2) that AccuSoft had not demonstrated that it suffered monetary damages as a result of Snowbound's breaches.

Finally, the master issued several brief memoranda concerning the allocation of the audit costs and attorneys' fees and related litigation costs. All costs of the audit ($25,000) were charged to AccuSoft, pursuant to the settlement agreement itself, which established a sliding scale for apportioning audit costs based on the degree of underpayment identified. However, AccuSoft was awarded in excess of $149,000 in attorneys' fees (plus an unspecified amount of interest) under a provision of the agreement the master interpreted as allowing a party proving breach to recover its fees for prosecuting a contempt motion, even if no substantive damages were recovered.

The master's final submission to the district court, which included all of the above memoranda, was made on October 5, 1998. On April 5, 1999, following a further round of motions by the parties challenging various of the conclusions contained in the master's consolidated report, Judge Gorton adopted the report in full. These appeals followed.

II.

On appeal, the parties challenge aspects of the master's conclusions[4] with respect to each of the three classes of issues that the master addressed: royalties; contempt; and allocation of attorneys' fees and costs. AccuSoft also challenges an interlocutory ruling of the master limiting the scope of discovery during hearings on the contempt issue. In the interest of consistency, we follow the master's categorical division of the issues, discussing the interlocutory ruling as part of our review of the master's disposition of the parties' substantive allegations of contempt. Within categories, we order the subjects with an eye toward clear exposition of the issues and logical development of our conclusions.

A.       Royalties Owed to Snowbound

Both parties ask us to revisit the master's assessment of the royalties owed by AccuSoft to Snowbound under the settlement agreement. Snowbound asserts two claims of error: (1) that the master misinterpreted relevant contract language in deciding that AccuSoft was entitled to retain the entirety of licensing fees it received after August 31, 1996, pursuant to

_____

[4]       In the analysis that follows, we refer to the conclusions below as those of the master. Because the master's conclusions were adopted without exception by the district court, they are equivalent to rulings of the district court itself for purposes of our review. See Fed. R. Civ. P. 52(a) ("The findings of a master, to the extent a court adopts them, shall be considered as the findings of the court.").

-10-

pre-existing agreements with America OnLine ("AOL") and Lexis-Nexis; and (2) that the master improperly allowed AccuSoft to pay royalties on only a portion of the income received from licenses that included both the IFL and AccuSoft's replacement product, ImageGear. AccuSoft, for its part, asks us to reverse the master's decision to award to Snowbound all revenues received after August 31, 1996 pursuant to an agreement with Lifeboat Japan, Inc. on the ground that this conclusion is unsupported by either the settlement agreement or applicable law.

Our consideration of the foregoing matters is governed by familiar standards of review. To the extent that the questions presented turn on the language of the settlement agreement or other contracts, we have considerable freedom to draw our own conclusions, guided by the language of the agreement, the circumstances of its formation and its purposes -- "in brief, by the usual considerations of contract interpretation." AMF v. Jewett, 711 F.2d 1096, 1102 (1st Cir. 1983) (as modified on denial of rehearing and rehearing en banc Aug. 26, 1983);[5] see also Langton v. Johnson, 928 F.2d 1206, 1220

---

[5]    To the extent that we rely on legal principles from a specific jurisdiction in interpreting the settlement agreement, we follow the parties in applying the law of Massachusetts. We note that the applicability of Massachusetts law is not a given in this case, since the agreement includes no choice of law

-11-

(1st Cir. 1991) (noting that interpretation of a settlement agreement between private parties "is akin to a contractual interpretation, and is thus largely a conclusion of law"); cf. Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989) ("Contract interpretation presents, in the first instance, a question of law, and is therefore the court's responsibility."). However, we will not disturb the master's factual findings unless they are clearly erroneous. Fed. R. Civ. P. 52(a).[6] Included in the latter category are factual findings concerning the intent of the parties where contract language is ambiguous. RCI Northeast Serv. Div. v. Boston Edison Co., 822 F.2d 199, 202 (1st Cir. 1987) (district court's findings concerning intent based on examination of dealings of parties were "sufficiently factbound to fit comfortably" within the scope of Fed. R. Civ. P. 52(a)).

---

provision and, once incorporated as a court order in a federal court, is arguably subject to interpretation under federal law. However, given the parties' apparent consensus that the law of Massachusetts applies, we need not resolve that question here. See, e.g., Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991) (noting that parties are bound by plausible choices of law made in proceedings below).

[6]    Although the clearly erroneous standard would apply to factual findings in any event, we note that Paragraph 15 of the settlement agreement, which requires disputes over royalties to be referred to a master for resolution, specifically states that "[t]he findings of facts [sic] of the Master shall be final unless clearly erroneous."

-12-

1.    Income from AOL and Lexis-Nexis

In April 1994, AccuSoft entered into an agreement with AOL to license the IFL software for distribution as a component of AOL's software products.  This agreement was amended by the parties in July 1995.  The amendment provided that AOL's license would run for a period of one year from the amendment's effective date (July 1, 1995), and, thereafter, would renew for additional one-year periods automatically, at specified royalty rates, unless terminated by the parties.  AOL continued to make payments, and neither party moved to terminate the agreement, with the result that the license continued in effect after August 31, 1996.  During the "audit phase" of this case, both Snowbound and AccuSoft asserted that the revenue stream issuing from this agreement after August 31, 1996, belonged to it under the settlement agreement.

In February 1995, AccuSoft entered into a licensing agreement with Lexis-Nexis which permitted Lexis-Nexis to "distribute, lease and market" the IFL as a component of the programs used to access Lexis-Nexis' services.  An addendum to the agreement, signed the same day, specified that the agreement would initially terminate in December 1995, but that Lexis-Nexis could, at its option, extend the agreement for a second and then a third year by paying stated amounts before the end of each

prior year. It also provided that Lexis-Nexis could, by paying an additional amount before the end of the second year, convert the license to a "perpetual, fully paid-up license" effective January 1, 1998. In January 1997, Lexis-Nexis paid AccuSoft $35,000, representing the $25,000 annual renewal for the 1997 calendar year and the $10,000 specified for converting the license to a perpetual license. Both AccuSoft and Snowbound argued before the master that this income belonged to it under the settlement agreement.

In his memorandum, the master ruled that AccuSoft was entitled to retain the entirety of both the AOL revenue stream and the Lexis-Nexis payments, because the settlement agreement did not affect the continuation of licensing agreements already in effect on June 5, 1996 -- when the settlement agreement was signed -- nor did it provide for royalties to be paid on such licenses. The master noted that nothing in the settlement agreement expressly addressed the continuation of existing licenses. He also found nothing in the agreement to implicitly require their termination or transfer to Snowbound. Although the settlement agreement clearly did transfer AccuSoft's copyright in the IFL to Snowbound, the master accepted AccuSoft's contention that a non-exclusive license issued by AccuSoft before the settlement agreement was signed would

continue in effect under 17 U.S.C. § 204(e).[7]  The master also agreed with AccuSoft that the language accomplishing the transfer of copyright did not transfer AccuSoft's collateral contractual rights in existing IFL licensing agreements, including the right to receive payment under such agreements.

Turning to the AOL and Lexis-Nexis licensing agreements, the master found in each case that the agreements constituted continuing licenses, rejecting Snowbound's argument that the renewal of the licenses was tantamount to issuance of a "new" license after August 31, 1996.  The master interpreted the AOL agreement to create, in effect, a perpetual license, conditioned only on payment, that would continue "unless and until an affirmative act is done by either AccuSoft or AOL which breaks the continuity of the license."  Similarly, the Lexis-Nexis agreement "continue[d] in effect from the date of the Addendum . . . without a new grant or extension of rights."  On this basis, the master ruled that AccuSoft could retain any and all revenues resulting from annual renewals of the AOL agreement

---

[7]     This section provides, in pertinent part, that "a nonexclusive license, whether recorded or not, prevails over a conflicting transfer of copyright if the license is evidenced by a written instrument signed by the owner of the rights licensed . . . and . . . the license was taken before execution of the transfer."  17 U.S.C. § 204(e).  Nothing in Snowbound's appeal suggests that Snowbound disputes the applicability of this statute or the import of its application.

-15-

after August 31, 1996, as well as the entirety of the January 1997 payment from Lexis-Nexis.

On appeal, Snowbound's principal contention is that the master improperly interpreted the settlement agreement. Snowbound admits that there is a "lack of pertinent language" in the settlement agreement, but argues that "the entire tenor of the Settlement Agreement is that after August 31, 1996, AccuSoft was to have no further dealings of any kind with the IFL" (emphasis added). Snowbound also notes that the settlement agreement provided for royalty payments to be made to Snowbound, and that AccuSoft had paid royalties to Palo on IFL sales even before the settlement agreement was signed. Given this "historical and contractual context," Snowbound argues, it "makes no sense . . . to infer that Palo intended AccuSoft to keep the entirety of [the income from AOL and Lexis-Nexis]." Taking a different tack, Snowbound also argues that the AOL agreement, at least, is not properly viewed as a continuing license, because its terms allow AccuSoft to terminate upon 120 days notice for any reason.

We are not persuaded to adopt the interpretation of the settlement agreement that Snowbound proposes. As we have previously stated, when sophisticated business entities enter into a settlement agreement, they "rely upon and have a right to

-16-

expect a fairly literal interpretation of the bargain that was struck and approved by the court." Jewett, 711 F.2d at 1101. We have also made clear that we do not consider it our place to "rewrite contracts freely entered into between sophisticated business entities." Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 855 (1st Cir. 1987). Here, it is undisputed that the parties are business entities of reasonable sophistication who drafted a settlement agreement with the extensive participation of attorneys on both sides. It is also undisputed that the settlement agreement does not, by its terms, either terminate pre-existing licenses issued by AccuSoft or transfer collateral contractual benefits resulting from existing licensing agreements to Snowbound. Under such circumstances, we consider it "far wiser for a court to honor the parties' words than to imply other and further promises out of thin air." Id.

We are particularly loath to do so given the conclusory arguments advanced by Snowbound in favor of its interpretation. We do not consider it obvious that the master's decision is contrary to the "entire tenor" of the agreement, and Snowbound provides nothing beyond its bare assertion to convince us otherwise. While Snowbound's contention that it "makes no sense" to infer that Palo/Snowbound intended that these revenues should pass to AccuSoft royalty-free strikes us as plausible, it

-17-

is also irrelevant to our analysis. Whether or not Snowbound anticipated this result (and we acknowledge the possibility that Snowbound simply did not consider what would happen to continuing agreements), it is not our role "to accomplish by judicial fiat what a party neglected to achieve contractually." Northern Heel Corp. v. Compo Indus., Inc., 851 F.2d 456, 466 (1st Cir. 1988) (quoting RCI Northeast Serv. Div., 822 F.2d at 204) (internal punctuation omitted). Furthermore, we note the master's finding that Palo knew of at least the AOL licensing agreement during settlement negotiations, which Snowbound does not dispute. Under such circumstances, Snowbound took the risk that its unspoken understanding was incorrect and thus was not entitled to rest on this unilateral belief that future rights associated with the AOL agreement were comprehended in the language of the settlement agreement.

Finally, we find no merit in Snowbound's argument that the AOL license renewal constituted a "new" license simply because it was subject to termination at either party's discretion. We do not agree that the fact that AccuSoft could have terminated its agreement with AOL, but did not, amounts to the same thing as the affirmative grant of a new license. As previously noted, the settlement agreement did not oblige

-18-

AccuSoft to terminate the license; AccuSoft therefore did not violate the agreement by taking no action.

For the foregoing reasons, we affirm the master's decision with respect to the revenues received under the AOL and Lexis-Nexis licensing agreements.

2.    Allocation of Split Licenses

In June and July 1996, AccuSoft entered into licensing agreements with Aimtech Corporation ("Aimtech"), NetObjects, Inc. ("NetObjects"), and Caere Corporation ("Caere") (collectively "licensees"), granting the recipients the right to distribute, as part of their software products, both the IFL and AccuSoft's successor product, ImageGear.   Each agreement included a provision allocating the licensing fee between the two products.  The provision stated that the portion of the fee associated with the IFL license was based on specified estimates (these estimates apparently came from the customers) concerning the number of copies of the IFL that would be sold.   The remainder of the licensing fee was for an unlimited license to use ImageGear.

At the hearing before the master, Snowbound argued that, although the agreements recited this allocation of the licensing fees between the two products, other language in the agreements suggested that the licensees were not obligated to

-19-

limit their IFL sales to the levels on which the fee allocation was based.[8]  The NetObjects agreement, for example, stated that "[t]his is a fully paid up license fee and no additional fees are due from Customer during the term of this Agreement," and also provided that "[t]he fees under this agreement are not returnable."  Snowbound contended that this language, and similar language in the other agreements, suggested that the licensees effectively obtained unlimited licenses to the IFL and were not bound by the allocations.  Snowbound also asserted that it was not clear that the licensees had ever in fact switched to using ImageGear.  On the basis of these arguments, Snowbound claimed the entirety of the licensing fee from each agreement. AccuSoft, for its part, contended that the license allocations were intended to be enforceable and presented testimony of its officers stating that they believed the allocations were enforceable when they signed the agreements.

In his memorandum, the master rejected Snowbound's position with minimal analysis, stating, without elaboration, that "in the absence of language in the Settlement Agreement that addresses this issue . . . Palo has not established a right

---

[8]     Snowbound also argues that these licensing agreements violated provisions of the settlement agreement prescribing the form of licenses AccuSoft could issue and therefore constituted contempt of the court's order.  We review this assertion in Part B.1.b, infra.

to claim all of the income in these distribution licenses as [income subject to the settlement agreement's royalty provisions]." The master then directed AccuSoft to pay royalties based on the portion of the license fees allocated to the IFL in each agreement. On appeal, Snowbound presses its point that this conclusion is incorrect "because there was no evidence in the record that the licensees ever used any product other than the IFL, or ever restrained their use of the IFL to the numbers stated in the nominal 'allocations.'"

Although the master's decision is short on detailed analysis, we believe that his conclusion concerning the royalties owed by AccuSoft withstands Snowbound's challenges. In so deciding, we need not, and do not, decide the questions of interpretation pressed by Snowbound. Even assuming arguendo that Snowbound is right that the allocations contained in the licenses were not enforceable, we conclude that Snowbound would not be entitled to additional royalties unless the licensees actually sold more products containing the IFL than were set forth in the allocations. As Snowbound itself argues, the settlement agreement included as Exhibit B a per-copy price list intended to govern AccuSoft's sales of the IFL through August 31, 1996. Our review of the three agreements indicates that the portion of the licensing fee allocated to the IFL in each

agreement accurately incorporates the applicable per-copy price. If that allocation were honored, we find nothing in the settlement agreement to suggest that Snowbound is entitled to any more than the appropriate royalty on the allocation amount, which is precisely what the master ordered.[9]

Snowbound points to no evidence in the record that demonstrates that the allocations were not honored. In its brief, Snowbound attempts to place the burden on AccuSoft on this point, claiming that there is "no evidence in the record" that the licensees kept to the allocation limits. However, it was plainly Snowbound's burden to introduce evidence indicating that the allocation limits were exceeded.[10] Absent such evidence, the master was under no obligation to disregard the numbers contained in the agreements in determining the amount of royalties due Snowbound. We therefore affirm.

3.     Income from Lifeboat Japan

_____

[9] Although Snowbound makes much of the fact that one or more of the licensees never switched to ImageGear, that fact, by itself, is irrelevant to whether Snowbound was appropriately paid for IFL sales. Aimtech, NetObjects, and Caere were entitled to make whatever use they wished, including no use at all, of the ImageGear license they purchased simultaneously with their IFL license.

[10] Indeed, from our review of the record, it appears that Snowbound requested, and was granted, the right to conduct discovery into the question of how the licensees viewed their obligations under the licensing agreements. We find no evidence that Snowbound did so, nor any explanation for why it did not.

-22-

From October 1995 until at least February 1997, Lifeboat Japan Inc. ("Lifeboat") paid licensing fees to AccuSoft under an agreement which permitted Lifeboat to sell copies of the IFL in the Japanese market in return for a percentage of the income on those sales.[11] The agreement between AccuSoft and Lifeboat, as initially executed by the parties, ran through July 1996. However, in April 1996, after AccuSoft and Snowbound had filed suit against each other and shortly before Judge Gorton issued his injunction, AccuSoft extended the arrangement to July 1997. The extension of the Lifeboat agreement never was revealed to Snowbound during the settlement negotiations that followed. Indeed, AccuSoft did not acknowledge until March 1997 that sales by Lifeboat continued past August 31, 1996, having earlier represented to the master's auditor that Lifeboat's sales terminated by the cutoff date.

The issue before us centers on the disposition of revenues resulting from Lifeboat's sales of the IFL after August 31, 1996. In the proceedings below, AccuSoft argued that it was

---

[11] AccuSoft appears to dispute, to some degree, the characterization of Lifeboat as a "reseller," and points to statements in the record to the effect that Lifeboat actually sold its own product incorporating the IFL. Nothing identified by AccuSoft is adequate to cause us to disturb the master's factual finding that Lifeboat is properly characterized as a reseller and we adopt that characterization in the analysis that follows.

entitled to the entirety of this income, advancing the same argument that it made, successfully, with respect to income resulting from the AOL and Lexis-Nexis licensing agreements after the cutoff. See supra. In the case of Lifeboat, however, the master reached a different result. The master found that AccuSoft's conduct surrounding the Lifeboat extension -- principally, AccuSoft's failure to reveal its existence to Snowbound -- violated an implied duty of good faith and fair dealing imposed on AccuSoft as a party to the settlement agreement.[12] In support of this conclusion the master noted that the extension was executed "at a time when Palo was challenging AccuSoft's rights in court." In addition, the master pointed out that Lifeboat's ability as a reseller to continue to

---

[12]    In the interest of completeness, we note that the master's report appears to advance a second argument for allocating the Lifeboat revenues to Snowbound; an argument that Snowbound briefly references on appeal. The master begins from the fact that, in his interpretation, the settlement agreement transferred all of AccuSoft's ownership interest in the IFL to Snowbound. From that, the master reasons that AccuSoft's activities with respect to the IFL must be limited to those actions expressly "given back" under the settlement agreement. We find little support for this argument in the settlement agreement. Indeed, as discussed in Part II.B.2.c of this opinion, we believe that the settlement agreement did not transfer "ownership" of the IFL to Snowbound. In addition, we find it difficult to square this analysis with the master's allocation of the AOL and Lexis-Nexis revenues to AccuSoft – outcomes that were plainly not provided for in the settlement agreement. For both reasons, we reject this as an alternative ground supporting the master's conclusion.

distribute the IFL as a stand-alone product "absolutely contradict[ed]" the "express intention" of the settlement agreement that "all distribution [of the IFL] by or through AccuSoft will cease on August 31, 1996." Because of this violation of the duty of good faith and fair dealing, the master concluded that AccuSoft should not be allowed to retain the Lifeboat income, and determined that the entirety of the income resulting from sales after August 31, 1996, must be paid to Palo.

On appeal, AccuSoft argues that the master erroneously used the duty of good faith and fair dealing to create obligations that exist nowhere in the agreement between the parties. While sympathetic to the master's frustration with AccuSoft's lack of candor, we must agree. The implied covenant of good faith and fair dealing between parties to a contract provides that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Druker v. Roland Wm. Jutras Assoc., 348 N.E.2d 763, 765 (Mass. 1976) (quoting Uproar Co. v. Nat'l Broadcasting Co., 81 F.2d 373, 377 (1st Cir. 1936)). It is implicit in that definition, and made explicit in our precedent, that the prohibition contained in the covenant applies only to conduct during performance of the contract, not

to conduct occurring prior to the contract's existence, such as conduct affecting contract negotiations. E.g., FDIC v. LeBlanc, 85 F.3d 815, 822 (1st Cir. 1996); see also Restatement (Second) of the Law of Contracts § 205, cmt. c (noting that bad faith in contract negotiations is not reached by the implied duty of good faith and fair dealing, but instead by concepts such as fraud in the inducement or absence of agreement). Equally clear from this definition is that the requirement of good-faith performance ultimately is circumscribed by the obligations -- the contractual "fruits" -- actually contained in the agreement. See LeBlanc, 85 F.3d at 822 (holding that an obligation to negotiate subsequent agreements in good faith would not be imputed under the implied duty of good faith and fair dealing where the original agreement included no such requirement).

The master's application of the duty of good faith and fair dealing cannot be squared with the above principles. As AccuSoft notes, the master's opinion acknowledges that the settlement agreement simply does not address the continuation of pre-existing agreements. To the extent this is an accurate interpretation of the contract, we do not see how good faith performance could nonetheless require AccuSoft to surrender the income on certain such agreements.

We need not, however, decide this question of contractual interpretation as the master's rationale fails on a narrower ground. It is undisputed that AccuSoft's extension of the Lifeboat agreement occurred before the settlement agreement was signed. Therefore, neither execution of the extension nor AccuSoft's silence about it while negotiating the settlement agreement can form the basis for a violation of the duty of good faith and fair dealing. No one has suggested that AccuSoft's mere continued silence _after_ the settlement agreement was signed constituted a violation of the duty.[13] Since we find no evidence identified in the record on which a violation of the covenant of good faith and fair dealing could rest, the master's conclusion cannot be supported on the legal grounds offered.

In its motion papers, Snowbound proposes an alternative ground for affirming the master's conclusion which we believe merits a response.[14] Snowbound contends that AccuSoft's

---

[13] We find nothing in the settlement agreement that would require AccuSoft to disclose the existence of the extension. Furthermore, we do not see how disclosure after the settlement agreement was signed could have in any way affected Snowbound's ability to obtain the fruits of the agreement. The terms of the settlement agreement, including its failure to adequately address pre-existing agreements like Lifeboat's, were at that point fixed.

[14] Yet another contention, raised by Snowbound's counsel at oral argument, is that Snowbound might be entitled to royalties on the Lifeboat agreement pursuant to a pre-existing royalty agreement between the present parties. Given that

nondisclosure of the Lifeboat extension violated a warranty provision of the Assignment of Copyright, which stated, in pertinent part:

> AccuSoft represents and warrants to the best of its knowledge, that it has made no transfer, assignment, or license (other than non-exclusive licenses in the ordinary course of business) with respect to the Software or any part thereof . . . .

In Snowbound's view, AccuSoft's "premature extension of Lifeboat's distributorship, made days before an anticipated ruling from the court that could have terminated AccuSoft's right to sell the IFL for good," cannot be considered to be a license entered into "in the ordinary course of business." As a result, AccuSoft was in breach of the warranty from the moment it was signed.

Although Snowbound's argument is facially credible, Snowbound fails to identify record evidence adequate for us to find that AccuSoft's extension of the Lifeboat agreement was not executed in the "ordinary course of business." The determination of what is or is not comprehended in the phrase "ordinary course of business" is necessarily fact-specific, involving consideration of all the circumstances of the conduct

---

Paragraph 18 of the settlement agreement specifically provides that it will "supersede all prior agreements between the parties and each and every term thereof," this argument is unavailing.

or transaction at issue.  See Demoulas v. Demoulas Super Markets, 677 N.E.2d 159, 202 (Mass. 1996) (concluding, in the context of a contempt action, that whether a transaction occurred in the ordinary course of business is a question of fact; the court looks to the prior course of dealings between the parties involved and the circumstances of the transaction to determine whether the transaction was part of the defendant's "normal, day-to-day business operations").  In this determination, the timing of the Lifeboat extension is relevant, see id. (noting that the timing of a transaction is one of the factors to be considered), but we do not believe that, standing alone, it is sufficient to convince us that AccuSoft violated the commitment contained in its warranty.  Since Snowbound has pointed to no other record evidence supporting its position, we cannot affirm the master's conclusion on this basis.

In light of the preceding, we hold that the master's allocation of the entirety of the Lifeboat revenues to Palo must be vacated.  In so doing, however, we acknowledge that this determination does not fully resolve the rights of the parties in regard to this revenue.  Given the timing of the Lifeboat extension, it seems possible that AccuSoft would nonetheless owe

some portion of these revenues to Snowbound as royalties.[15]  This issue was not briefed on appeal and we do not believe that the record provides an adequate basis for us to decide how the settlement agreement's royalty provisions might apply.  We therefore remand to the district court for a determination of what, if any, royalties are due Palo on the Lifeboat revenues.

---

[15]     Indeed, it appears from the record that AccuSoft itself took this position at one point in the proceedings before the master.  The master rejected the argument at that point because he  considered AccuSoft to have no rights in regard to the income.

B.        Rulings on Allegations of Contempt

Both AccuSoft and Snowbound dispute aspects of the master's memorandum disposing of their allegations of contempt. In assessing these claims of error, we employ the aforementioned standards of review with respect to the master's factual findings and his interpretation of the settlement agreement's terms.   With respect to the master's ultimate findings on contempt, however, we review only for abuse of discretion. E.g., Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 15-16 (1st Cir. 1991).   In the context of contempt rulings, we have said, the abuse of discretion standard "will be administered flexibly," depending on the circumstances of the case.   Id. at 16.   In particular, "greater deference is owed to the trial court in public law litigation than in purely private litigation."   Id. We also have stated that, in recognition of the fact that the contempt power is a "potent weapon," our review will proceed more searchingly when we confront a finding of contempt than when we consider a decision "exonerating a putative contemnor." Id.

Our assessment of the master's deployment of the contempt power also incorporates various prudential principles we have adopted in recognition of the contempt power's "virility and damage potential."   Id.   A complainant "must prove civil

-31-

contempt by clear and convincing evidence." Id.; accord Gemco LatinoAmerica, Inc. v. Seiko Time Corp., 61 F.3d 94, 98 (1st Cir. 1995). In addition, contempt may only be established if the order allegedly violated is "clear and unambiguous." Project B.A.S.I.C., 947 F.2d at 16; see also id. at 17 (stating that "the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden"). "[C]ourts are to construe ambiguities and omissions in consent decrees as redounding to the benefit of the person charged with contempt." Gilday v. Dubois, 124 F.3d 277, 282 (1st Cir. 1997) (internal citations and punctuation omitted).

Finally, we bear in mind that, while good-faith efforts alone do not insulate a defendant in a contempt action, see Star Fin. Servs. Inc. v. AASTAR Mortg. Corp., 89 F.3d 5, 10 (1st Cir. 1996) ("An act does not cease to be a violation of law and of a decree merely because it may have been done innocently."), our precedent permits a finding of contempt to be averted where diligent efforts result in substantial compliance with the underlying order. Langton, 928 F.2d at 1220. The determination of whether substantial compliance has been achieved will "depend on the circumstances of each case, including the nature of the interest at stake and the degree to which noncompliance affects that interest." Fortin v. Comm'r of Mass. Dept. of Pub.

-32-

<u>Welfare</u>, 692 F.2d 790, 795 (1st Cir. 1982).  For this reason, a court may decline to find a party in contempt despite the failure to achieve "letter perfect compliance" with the order at issue.  <u>Langton</u>, 928 F.2d at 1222.

1.    Snowbound's Claims of Error

Having failed to convince the master to find AccuSoft in contempt of any aspect of the settlement agreement,[16] Snowbound, on appeal, reasserts its arguments for several such claims.  With but one exception, we find no reason to disturb the master's conclusions as adopted by the district court.

a.    Failure to Find that AccuSoft's Nonpayment of Royalties and Improper Accounting Practices Constituted Contempt

In the proceedings below, Snowbound sought to hold AccuSoft in contempt for its nonpayment of royalties due under the settlement agreement and what Snowbound deemed to be fraudulent accounting practices surrounding AccuSoft's IFL sales.  As previously indicated, the master found that AccuSoft had, in several instances, failed to pay royalties owed under the settlement agreement.[17]  The master also found that AccuSoft had engaged in certain "sharp practices," such as initiating

---

[16]    Here, and in the discussion that follows, we occasionally use the phrase "contempt of the settlement agreement."  This phrase is employed in the interest of brevity as shorthand for "contempt of the court order incorporating the settlement agreement."

[17]    The total amount of unpaid royalties (less the royalties on improper "returns" discussed below) was later calculated to be approximately $145,000.  Of this, almost $122,000 reflected the master's allocation of revenues from the Lifeboat licensing agreement, an allocation which we have concluded must be vacated.

exchanges of the IFL for AccuSoft's replacement product, ImageGear, then seeking to claim a credit for such exchanges as "returns" under Paragraph 1 of the settlement agreement.[18] Finally, the master found evidence that AccuSoft had been less than forthcoming in responding to the audit that Snowbound had initiated pursuant to Paragraph 5 of the settlement agreement.

Ultimately, however, the master concluded that Snowbound had failed to produce "clear and convincing evidence" that AccuSoft's actions constituted contempt. The master grounded his decision principally on language in paragraph 15 of the settlement agreement, which states:

> In the event that there is a dispute concerning the amount of AccuSoft's Software Gross Billings[19] as provided for herein, the Court shall appoint a Master pursuant to Fed. R. Civ. P. 53. The findings of facts [sic] of the Master shall be final unless clearly erroneous. The compensation for said Master shall be split equally between the parties.

The master interpreted this language to create an alternative dispute resolution process for addressing any "allegations of

---

[18] AccuSoft deducted $135,023 in "returns" from the royalty base under this provision, none of which the master found to be properly deductible. The master ultimately found that this resulted in AccuSoft failing to pay $33,481 in royalties due under the agreement.

[19] The term "Software Gross Billings" is used to identify the revenue base on which royalty amounts are calculated.

non-payment or improper accounting" that might arise when the agreement was implemented. Because the parties had provided this process, the master reasoned, nonpayment or improper calculation of royalties would not become contempt of the settlement agreement "until and unless either party disregarded the Master's findings and order."

The master acknowledged that certain conduct attributed to AccuSoft by Snowbound, including intentional falsification of records to conceal IFL sales, would independently violate the settlement agreement and therefore provide a basis for contempt. However, he found that the evidence introduced by Snowbound with respect to these activities, including evidence regarding the improper "returns" of IFL and inconsistencies in the recording of certain sales, did not constitute the "clear and convincing evidence" of a violation of a specific requirement of the settlement agreement necessary to support a finding of contempt. The master noted that his independent auditor did not find evidence that AccuSoft had engaged in "purposeful falsification" of the records. Furthermore, the master found that, in many cases, the position AccuSoft took to justify its actions "was not without support in the Settlement Agreement," even if the master ultimately determined that AccuSoft's approach to the calculation of royalties was not correct.

On appeal, Snowbound argues that the master was wrong to conclude that the dispute resolution process insulated AccuSoft from the contempt sanction unless AccuSoft failed to pay royalties after the master had issued his ruling. Snowbound contends that reading the settlement agreement this way effectively nullifies the payment deadlines contained in Paragraph 5 of the agreement, as AccuSoft could avoid payment "with impunity" until the master had finally determined the issue. According to Snowbound's interpretation, the dispute resolution provision did not relieve AccuSoft of the obligation to pay royalties on the deadlines but merely provided, in advance, for the mechanism that would be used to determine whether a breach of the agreement had occurred.

Snowbound's argument is not without some force and we concede uncertainty as to whether the provision for resolution of disputes by a master should be read to foreclose all contempt actions grounded in "non-payment and improper accounting." Nonetheless, bearing in mind the cautionary principles guiding exercise of the contempt sanction -- particularly the requirement that contempt requires the violation of "an unambiguous consent decree that left no reasonable doubt as to what behavior was to be expected," Gilday, 124 F.3d at 282 (internal quotation marks omitted) -- we are not prepared to say

that the master's failure to find AccuSoft in contempt for these actions was an abuse of discretion.

Snowbound also presses again its claim that AccuSoft should be found in contempt because it engaged in deliberate falsifications of records and purposefully frustrated Snowbound's audit in order to avoid paying royalties owed under the settlement agreement. However, Snowbound adduces no evidence that compels us to believe that the master's findings to the contrary on this point are clearly erroneous. To the contrary, the master's position is amply supported by record evidence. We therefore affirm.

> b.      Failure to Find that the AccuSoft's Allocated Licenses for IFL and ImageGear Constituted Contempt

We have previously discussed Snowbound's contention that the master improperly calculated royalties due on certain licensing agreements which purported to convey licenses to both the IFL and AccuSoft's replacement product, ImageGear. In addition, Snowbound has asserted that issuance of these licenses constituted contempt of Paragraph 5 of the settlement agreement, which states:

> All distribution licenses will be at standard published rates in effect prior to May, 1996, a list of which is attached hereto as Exhibit B. If AccuSoft wishes to issue any distribution license on terms not listed on Exhibit B, it will submit those

-38-

terms . . . to Palo for his written approval
. . . .

In the proceedings below, Snowbound argued that the allocated licenses were effectively unlimited licenses because they did not create an enforceable limitation on the number of copies of IFL that could be sold.  As such, they did not conform to the price schedule contained in Exhibit B, which established fixed prices for stated numbers of copies.

Nothing in the master's memorandum on the contempt issues directly addresses Snowbound's arguments concerning the allocated licenses, although the master's determination that the allocations were a valid basis for calculating royalties arguably does so by implication.  On appeal, Snowbound presses its claim that "issuing a license without a clear and enforceable legal limitation on the licensee's use of the IFL—a limitation to standard amounts for standard prices--was a material breach of the agreement" and thus grounds for finding AccuSoft in contempt.

Although the master's failure to address this issue in straightforward terms is unfortunate, we do not find that a remand on this issue is required.  The argument Snowbound makes on appeal is premised solely on language contained in the licensing agreements, which, it claims, conflicts with the requirements imposed by the settlement agreement.  Snowbound

does not refer us to any factual information in the record bearing on this issue, and, indeed, we find no indication that any factual information was developed which might shed light on this claim, even though Snowbound was given permission to do so. As previously noted, the interpretation of settlement agreements and contracts, where no recourse to negotiating history or other extrinsic factors is required, is a question of law. Langton, 928 F.2d at 1220; Fashion House, 892 F.2d at 1083.

Having reviewed the relevant agreements, we conclude that Snowbound has not demonstrated that AccuSoft committed a breach of the settlement agreement for which it should be held in contempt. First, and despite Snowbound's protestations, it is not self-evident that the settlement agreement requires that licenses issued by AccuSoft contain a "clear and enforceable limitation" on the number of copies that can be sold. We agree that the settlement agreement language, reasonably read, would prohibit issuance of a license that stated a per-copy price for the IFL that was inconsistent with the "published rates" contained in Exhibit B.[20] We would also accept, for present purposes, that a license that unambiguously conveyed an unlimited license for a fixed price would not be "at" the

_____

[20]    As noted in our previous discussion of the allocated licenses, our review indicates that the per-copy prices recited in the three licenses are consistent those set out in Exhibit B.

Exhibit B rates. It is by no means obvious, however, that a license that stated a proper per-copy price would violate the settlement agreement simply because it proved to be unenforceable in certain respects. Nor do we consider it clear that the licenses at issue actually permitted the licensees to sell more copies of the IFL than stated in the allocations. Certain language, such as that stating the licenses are "fully paid up," arguably supports Snowbound's proposed interpretation. At the same time, we find arguable merit in AccuSoft's response that this language referred only to the ImageGear license. As previously noted, Snowbound has not introduced extrinsic evidence supporting its interpretation of the agreement.

Given the cautionary principles governing our use of the contempt sanction, we consider the unresolved ambiguities in the relevant agreements fatal to Snowbound's claim. Although the interpretations Snowbound advances are not illogical, they fall well short of constituting proof, by clear and convincing evidence, that AccuSoft violated the settlement agreement by issuing the licenses in question.

c.    Failure to Find AccuSoft in Contempt Because it did Not Maintain Records of IFL Sales Using Sequential Serial Numbers

As a third ground for contempt, Snowbound alleges that AccuSoft failed to maintain its records of IFL sales as required

by the last section of Paragraph 5 of the settlement agreement, which states:

> Each AccuSoft sale or license pursuant to this Paragraph will be identified by a serial number, issued sequentially beginning with the number 276745. AccuSoft will keep a list of each sale by serial number, which list will be made available to Palo's independent accountant . . . .

This argument was raised below by Snowbound, but, like Snowbound's contention that the allocated licenses constituted contempt, was not directly addressed by the master in his memorandum disposing of the contempt allegations. On appeal, Snowbound asks us to rectify the omission, pointing to language in one of the master's memoranda on audit costs which, it argues, constitutes a factual finding that no such records were kept. Because it considers the settlement agreement unambiguous as to this requirement, Snowbound contends that this finding obligates us to conclude, as a matter of law, that AccuSoft was in contempt.

Given the heavy burden of proof our precedent places on a party alleging contempt, we do not agree that the current record provides an adequate basis for resolving the issue in Snowbound's favor. The language to which Snowbound refers, although it does state that AccuSoft "failed to maintain" the sequential list of IFL sales required by the settlement

agreement, appears in a discussion of the allocation of audit costs, contained in a memorandum issued _after_ the master had ruled on the parties' contempt allegations. It is not clear that the master intended the statement to stand as a formal finding of fact, and there is certainly no suggestion in the record that it was meant to carry the weight Snowbound would have it bear. Nor can we consider the matter free from dispute, as AccuSoft points to several exhibits appearing to show that sequential serial numbers, meeting the requirements of the settlement agreement, _were_ used for at least some IFL sales. Under the circumstances, the master's brief statement does not constitute proof, by clear and convincing evidence, of contempt.

At the same time, however, we conclude that we cannot resolve this matter in AccuSoft's favor either. The master's statement at a minimum indicates that he harbored some doubt about AccuSoft's compliance with this requirement. On the basis of the current record, we cannot foreclose the possibility that the master, once he squarely confronts the issue, might find that AccuSoft's failure to comply fully constitutes contempt. While we see comparatively little chance that such contempt, if proven, could be linked to any significant damages -- or attorneys' fees, given our interpretation of the fee-shifting

provision contained in the agreement -- we leave those determinations to the district court on remand.

        d.      <u>Failure to Find AccuSoft in Contempt on the Basis of Written and Oral Statements</u>

Snowbound's final claim of error with respect to the master's contempt rulings is that the master improperly failed to find AccuSoft in contempt for various statements that it made to third parties both orally and in writing. In the proceedings below, Snowbound argued that AccuSoft made numerous statements that violated Paragraph 9 of the settlement agreement, which states, in pertinent part, that:

> AccuSoft will not hereafter represent explicitly or in substance to anyone that its forthcoming new image software toolkit . . . "ImageGear," is based upon or derived from the Image Format Library."

As examples, Snowbound pointed to the fact that AccuSoft's advertising materials referred to ImageGear as "Version 6.0" (the most recent version of the IFL was 5.0) and as the "new version of the AccuSoft Image Format Library." Similarly, AccuSoft's web page claimed that ImageGear "takes [AccuSoft's] existing Image Format Library product to a new level by adding new features, functions, flexibility and performance." Snowbound alleged that AccuSoft salespeople had similarly exceeded the limits of Paragraph 9 by, for example, stating in written communications with customers that "we are no longer

-44-

selling the Image Format Library version 5.0 . . . we are selling the 6.0 version called ImageGear."

While the master agreed that the statements identified by Snowbound suggested a "relationship" between the IFL and ImageGear, he interpreted Paragraph 9 to prohibit a narrower class of statements: those that "convey the . . . suggestion that ImageGear contains the same computer code as the IFL." The master found that the statements attributed to AccuSoft did not contain that suggestion. The master also considered affidavits from the counsel who negotiated the settlement agreement. These affidavits, he found, showed considerable difference of opinion as to what the parties intended Paragraph 9 to cover. In view of both the narrow construction he applied to the language and the ambiguity he detected in the parties' intent, he found that contempt had not been proven.

Snowbound also asserted that AccuSoft had made statements concerning its (and Snowbound's) ability to distribute, maintain and support the Image Format Library that impermissibly deviated from a "script" of approved statements contained in Paragraph 13 of the settlement agreement. Snowbound pointed to an e-mail from AccuSoft, issued days after the settlement agreement was signed, stating that AccuSoft had "full rights to market, sell, distribute, maintain and support

the Image Format Library."  Snowbound further noted that AccuSoft continued to refer to the IFL as the "AccuSoft Image Format Library," even after August 31, 1996, when its right to distribute the software had terminated.  Finally, Snowbound asserted that AccuSoft told certain customers who inquired about the IFL after August 31, 1996 that "[n]o one has rights to distribute the IFL," that "[t]he Image Format Library is no longer available from anywhere," or even that "Snowbound does not have the right to sell any licensing for the Image Format Library."

Here, again, the master found that the statements complained of had not clearly been demonstrated to violate the requirements of the settlement agreement.  The master noted that Paragraph 13, by its terms, only restricted the substance of "statements by either party to the public concerning the ownership of the Software" (emphasis added).  It therefore was not clear that Paragraph 13 covered AccuSoft's statements concerning who could sell or distribute the IFL.  Furthermore, the master found some merit in AccuSoft's contention that the settlement agreement, although it transferred the IFL software to Palo, did not clearly convey to Palo or Snowbound any rights to the product named the Image Format Library.  As such, AccuSoft's statement to its clients that the Image Format

Library was "not available from anywhere" was in some sense true -- although less than forthcoming -- after August 31, 1996, given that the only product then available using the IFL code was the one called RasterMaster.

The master apparently found AccuSoft's statement that it had "full rights" to the IFL to be the closest case, given his conclusion that the settlement agreement actually placed significant limits on AccuSoft's ability to continue distributing the IFL, including the requirement that such distribution cease entirely after August 31, 1996. Nonetheless, the master found that, from a purchaser's perspective, AccuSoft effectively had the "full rights" claimed at the time the statement was made. Moreover, he found that the statement was not "so much at variance" with the scripted statement -- AccuSoft was permitted to say that "AccuSoft will continue to distribute the AccuSoft Image Format Library" -- as to constitute contempt.

On appeal, Snowbound argues that the master's conclusions with respect to these alleged violations must be reversed because the master misinterpreted the requirements of the settlement agreement and the import of AccuSoft's statements. Although we acknowledge that the interpretations proposed by Snowbound, at least in certain instances, are

plausible, we do not believe Snowbound has met the heavy burden of demonstrating that the master abused his discretion by concluding otherwise.

With respect to the violations of Paragraph 9, we concede that the use of "Version 6.0" to describe ImageGear, taken in isolation, implies a relationship between it and Version 5.0 of the IFL that could include reliance on the same or similar underlying code. However, other statements in the advertisements and AccuSoft's web page quite clearly undercut that suggestion. For example, the first sentence of the advertisement text states: "AccuSoft Corporation announces a totally new product, ImageGear, the next generation in imaging technology" (emphasis added). Similarly, the web site states: "It's not a new version of an old product . . . it's new from the ground up, designed to the most current coding, quality and performance standards" (emphasis added). Given this, we see no reason to disturb the master's conclusion that these statements, taken as a whole, did not improperly suggest that ImageGear was "based on or derived from" the code contained in the IFL.

The written communications with customers, which include no such clarifying language, present a perceptibly closer case and, were we deciding this issue in the first instance, we are not certain that our conclusion with respect to

these statements would be the same as the master's. However, we do not find the master's conclusions so clearly wrong as to require us to find an abuse of discretion. The question of what AccuSoft's statements implied, in the context in which they were made, strikes us as one which the master was plainly in a superior position to answer. So too, we note that the master's inquiry into the negotiating history of the parties on the relevant language of Paragraph 9 led him to believe that the question of what was prohibited was not entirely understood by the parties. Under the circumstances, we are not convinced that the master's conclusion constitutes reversible error.

We are similarly unpersuaded that reversal of the master's conclusions regarding alleged violations of Paragraph 13 is justified. We agree with the master that the settlement agreement's scripts, which, by their terms, extend only to statements concerning the "ownership" of the software, are not unambiguously applicable to the statements AccuSoft made concerning rights to market and distribute the software. It also seems to us to stretch the scripts too far to assume that they would prohibit AccuSoft from making potentially accurate negative statements concerning Snowbound's distribution of the IFL when such statements did not conflict with those that the settlement agreement permitted.

Turning finally to AccuSoft's statement that it had "full rights to market, sell, distribute, maintain and support the Image Format Library," we again conclude that the master's conclusion should be affirmed, although, in this case, we rely on a different ground than did the master. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 10-11 (1st Cir. 2000) (holding that the appellate court is "not bound by the trial court's rationale, but may affirm [the trial court's] judgment for any valid reason that finds support in the record"). In our view, there is no doubt that AccuSoft's statement ultimately implies a claim regarding "ownership" of the IFL, and therefore is governed by Paragraph 13 of the settlement agreement. Equally clear, as the master found (and the scripts and the settlement agreement confirm) is that AccuSoft had, and could properly claim, only more limited rights in the software. The "full" rights to which AccuSoft sought to lay claim were transferred to Snowbound, and, in fact, Snowbound was specifically allowed to claim such full rights in the code underlying the IFL (and RasterMaster) by section b of Paragraph 13 of the settlement agreement. Given this, to the extent that the master's opinion rests on a finding that AccuSoft's statement did not conflict with the settlement agreement, we must disagree.

At the same time, we think that this comparatively minor departure from the settlement agreement's requirements does not, by itself, require a finding of civil contempt. As we have noted, "letter perfect compliance" with a court's order is not required -- only substantial compliance. Langton, 928 F.2d at 1222. While AccuSoft doubtless tried to portray its position following execution of the settlement agreement in a favorable light, most of its statements -- particularly those disseminated to the public generally -- were adequately qualified to avoid conflict with the settlement agreement's terms. We do not consider this single improper statement, contained in an e-mail between AccuSoft and one of its resellers, so significant as to require a finding that AccuSoft was not in substantial compliance with the relevant provisions of the settlement agreement. We therefore affirm the master's conclusion.

2.     AccuSoft's Claims of Error

In the proceedings below, the master found in AccuSoft's favor with respect to a number of its allegations of contemptuous conduct by Snowbound. In particular, the master found that several widely-disseminated statements by Snowbound violated the requirements of Paragraph 13 of the settlement agreement. These included statements issued almost immediately after the litigation, asserting that Snowbound had "won" the litigation and had "accomplished what it wanted" in the settlement agreement. Snowbound also was found to have violated the settlement agreement by using the words "AccuSoft" and "Image Format Library" in its advertisements, by revealing confidential terms of the settlement agreement to clients, and by failing to delete references to "Accu" or "AccuSoft" in products it distributed after the settlement agreement was signed.

However, the master ultimately rejected the relief sought by AccuSoft with respect to these breaches of the agreement. The master declined AccuSoft's request that it be excused from performance of its obligations under the agreement (principally payment of royalties) from the date of Snowbound's breach. The master also found that AccuSoft had failed to introduce evidence linking the proven breaches of the agreement

with any damages it had suffered.  On appeal AccuSoft challenges these conclusions, as well as rulings by the master limiting the scope of discovery with respect to damages.  AccuSoft also argues that the master should have separately found Snowbound in contempt for licensing the IFL under that name, as opposed to under its own brand name, RasterMaster.

a.  <u>Rejection of Request for Rescission of Settlement Agreement/Relief from Judgment</u>

In its initial motion for contempt, AccuSoft requested that it:

> be excused from making any and all further payments to Defendants . . . as a result of their wilful and deliberate breach of the bargained for exchange of payments for confidentiality and protection of AccuSoft's goodwill embodied in the Settlement Agreement.

In an amended motion, submitted in September 1996, AccuSoft reframed this argument more broadly as a request for relief from judgment pursuant to Fed. R. Civ. P. 60(b)(6) and for rescission of the settlement agreement in its entirety.  Citing our decision in <u>United States</u> v. <u>Baus</u>, 834 F.2d 1114 (1st Cir. 1981), AccuSoft argued that Snowbound's contempt justified the master in "relieving AccuSoft of the terms of the Judgment and Settlement Agreement."  AccuSoft's rescission request, fleshed out in a "post-trial" brief submitted at the close of the hearings before the master, sought an order that would "rescind

-53-

the Settlement Agreement and require the parties to return all consideration received, thereby returning them to the status quo that existed prior to the entry of the Settlement Agreement." As grounds for both forms of relief, AccuSoft argued that: (1) Snowbound had failed to honor "material and essential" terms of the settlement agreement; (2) AccuSoft's actual damages were "difficult or impossible to determine"; and (3) there was "no meeting of the minds and therefore no valid contract."

In his memorandum, the master rejected AccuSoft's claim for relief on two grounds. First, noting AccuSoft's delay in asserting its rescission claim until after the settlement agreement's August 31, 1996 cutoff had passed, the master found that AccuSoft's conduct constituted an election to continue to operate under the contract, thus precluding rescission. Canada-Atlantic & Plant S.S. Co., Ltd. v. Flanders, 165 F. 321, 323 (1st Cir. 1908). Furthermore, even if AccuSoft had not waived its right to such relief, the master found that Snowbound's breaches of the settlement agreement were not "sufficiently material" to justify rescission of the contract or to excuse AccuSoft from its obligation to perform. Although the master acknowledged that the confidentiality provisions of the settlement agreement were "important" to the parties, the master held that they did not constitute an "essential and inducing

feature of the contract." Lease-It, Inc. v. Mass. Port Auth., 600 N.E.2d 599, 602 (Mass. App. Ct. 1992) (discussing the standard of materiality for excusing a non-breaching party from performance). To the contrary, he concluded, "the most important features of the Settlement Agreement were those which permitted the parties to continue in business by releasing their claims to the other's software."

On appeal, AccuSoft's principal claim of error concerns the master's conclusion that Snowbound's breaches of the settlement agreement were not material. Accusoft contends that the master failed to appreciate that the confidentiality provisions were essential to the agreement because, in the small market the parties were competing in, revelations concerning the outcome of the litigation could severely impair AccuSoft's ability to continue to do business and to transition its current customers to the ImageGear software. In fact, AccuSoft argued, those provisions were the most important to AccuSoft because they protected its goodwill. Notably, and without explanation, AccuSoft does not address the master's alternative holding that AccuSoft is barred from relief by an implicit election to continue under the contract.

As we proceed to the merits of AccuSoft's appeal on this issue, we first address the fact that, on appeal, AccuSoft

once again appears to recast the nature of the relief it seeks. AccuSoft's most recent complaint, as well as its argument before the master (and, subsequently, before Judge Gorton), asked for complete rescission of the settlement agreement and, by implication, complete relief from judgment pursuant to Rule 60(b)(6). In the briefs submitted to this court, however, AccuSoft reverts to the version of this count contained in the initial complaint, asking simply to be excused from paying royalties from the date that Snowbound first breached the agreement by announcing that it had "won" the litigation.[21] AccuSoft also fails to press any specific argument for relief based on Rule 60(b)(6), although it could be concluded that AccuSoft's continuing references to our decision in Baus are intended to do so by implication.

The significance of this shift in tactics is unclear. Arguably, although Snowbound has not so contended, AccuSoft's request on appeal for a more limited remedy is subject to dismissal because it was not properly raised in the forum below. However, Massachusetts caselaw is not entirely clear on whether the line of precedent excusing a party from performance based on another party's breach may be viewed as deriving from the same

---

[21] Indeed, in its reply brief in this Court, AccuSoft states baldly it is "not seeking to rescind the Settlement Agreement."

source as the precedent regarding rescission. See Lease-It, Inc., 600 N.E.2d at 601-02 (discussing the right to cease performance while referencing authority concerning rescission). If Massachusetts law would treat the difference as going to the extent, rather than the nature, of the relief, AccuSoft could be found to have adequately preserved its position. Because it does not affect the result we reach, we accept arguendo that the relief requested on appeal is properly before us and, furthermore, that an argument under Rule 60(b)(6) is also properly preserved.

Turning to the substance of AccuSoft's appeal, we affirm the master's conclusion on the ground that AccuSoft, by electing to continue accepting benefits under the agreement, has lost any right it may have had to be excused from performance as a result of Snowbound's contempt.[22] It is well established that conduct indicating a willingness to continue to honor a contract, despite knowledge that the other party has failed to perform, "operates as a promise to perform in spite of that non-

---

[22]    In so holding, we specifically do not decide whether the master was right to conclude that Snowbound's violations of the settlement agreement were not "sufficiently material" to justify rescission or to excuse AccuSoft from its duty to perform.    Indeed, we find significant merit in AccuSoft's contention that the confidentiality requirements and related provisions related to publicity were critical components of the settlement agreement from AccuSoft's perspective.

occurrence." Restatement (Second) of Contracts, § 246; see also Flanders, 165 F. at 321 (1st Cir. 1908) (holding that a breach by one party gives the other the right of election to continue under the contract or to sue for rescission); accord Apex Pool Equip. Corp. v. Lee, 419 F.2d 556, 561 (2d Cir. 1969) ("[T]he power to terminate a continuing contract because of a particular breach of that contract is a power of election."). Here, AccuSoft plainly knew of Snowbound's breaches of the agreement within a short time of when they occurred, and, indeed, soon filed its first motion for contempt. Yet AccuSoft continued to accept the benefits of the settlement agreement and to act as if it were still in effect. It was not until several months later -- after August 31, 1996 -- that AccuSoft filed an amended pleading that made clear it sought rescission of the entire agreement. In the interim, AccuSoft availed itself of the ability to license the IFL in return for royalty payments, as well as the ability to sell ImageGear free from infringement claims. Indeed, by the time AccuSoft asserted its rescission claim, it had obtained all the benefits from the settlement agreement that it could. Under the circumstances, we agree with the master that AccuSoft was not entitled to cancel -- largely

retroactively -- its obligation to pay royalties.[23]  We therefore affirm the master's conclusion.

       b.      <u>Conclusion that AccuSoft Failed to Introduce Adequate Evidence of Damages</u>

In addition to rejecting AccuSoft's rescission claim, the master rejected AccuSoft's contention that it was entitled to be compensated for Snowbound's contempt with money damages. The master acknowledged that AccuSoft had introduced evidence showing that many of its customers from 1995 did not continue as customers in 1996 or later, and that many of those same customers had become customers of Snowbound.  The master also conceded that Accusoft had not reached its projected levels of growth in 1996 and beyond.  However, the master found that AccuSoft had failed to introduce "any evidence that these events occurred <u>because Snowbound breached the Settlement Agreement</u>" (emphasis added).

To the contrary, the master noted that the testimony suggested a number of reasons, unrelated to the alleged breaches

---

[23]     We acknowledge that nothing in our limited precedent concerning the circumstances under which relief from judgment pursuant to Rule 60(b)(6) will be granted specifically incorporates a parallel principle that a party may "elect" to accept non-performance of a settlement agreement, nor do we intend to establish such a general principle here.  However, we do find that, on the facts presented here, AccuSoft has not presented any "reason justifying relief from the operation of judgment."

of the agreement, that could explain these occurrences. It was apparent that many of AccuSoft's customers knew of the legal dispute between AccuSoft and the founders of Snowbound, and that some number also understood that the disputes concerned rights to the code contained in the IFL. AccuSoft's operations were also disrupted by the injunction entered by the court shortly before the infringement trial was to begin. Finally, AccuSoft faced, beginning in early 1996, a new and combative competitor (Snowbound), aggressively courting the same customers in a small niche market, and at a time when AccuSoft was having difficulty completing and marketing its own new product.

On appeal, AccuSoft argues first that the master applied the "wrong legal standard" in determining the sufficiency of AccuSoft's evidence of damages. Specifically, AccuSoft contends that the master ignored precedent indicating that damages can be recovered even where the amount of damages suffered cannot be calculated with certainty. See, e.g., Nat'l Merchandising Corp. v. Leyden, 348 N.E.2d 771, 774 (Mass. 1976) (noting, with respect to a claim for damages for interference with contractual relations, that "an element of uncertainty in the assessment of damages is not a bar to their recovery"). While the cases AccuSoft cites appear to be good law, AccuSoft's argument ultimately is irrelevant to the issue on appeal. We do

not read the master's conclusion to be that AccuSoft inadequately identified the <u>amount</u> of damages, but rather that AccuSoft could not demonstrate that <u>any</u> damages suffered were caused by breaches of the settlement agreement. Such proof of a causal nexus between Snowbound's breaches and the damages AccuSoft suffered is clearly required by Paragraph 16 of the settlement agreement[24] as well as by settled precedent. <u>See Burke v. Guiney</u>, 700 F.2d 767, 770 (1st Cir. 1983) ("In addition to presenting clear and convincing evidence that a court order has been violated, a party seeking monetary damages in civil contempt . . . must show that he has suffered damage <u>as a result of the violation</u>") (emphasis added); <u>see</u> <u>also</u> <u>In re Kave</u>, 760 F.2d 343, 351 (1st Cir. 1985) (explaining that compensatory damages for contempt are intended to "make whole the aggrieved party for damages <u>caused by the contemnor's conduct</u>") (emphasis added); <u>Town of Manchester v. Dept. of Envtl. Quality Eng'q</u>, 409 N.E.2d 176, 182 (Mass. 1980) ("Where a fine is imposed in a civil contempt proceeding it must not exceed the actual loss to the complainant <u>caused by the contemnor's violation of the order</u> . . . .") (emphasis added).

---

[24]    The relevant portion of Paragraph 16 states that "[i]f any party should breach any term of this Agreement, the other party will be entitled . . . to an award of its actual damages sustained <u>by reason of such breach</u> . . ." (emphasis added).

In the alternative, AccuSoft argues that it did offer evidence demonstrating that it suffered damages as a result of Snowbound's violations of the settlement agreement. However, based on the record evidence AccuSoft identifies in its motion papers, we are not persuaded to reverse the master's conclusion to the contrary. As we have previously stated, in evaluating a challenge to the award of damages, "we rely heavily on the judgment of the trial court, who has had the benefit of hearing all of the evidence." Clark v. Taylor, 710 F.2d 4, 13 (1st Cir. 1983). The evidence AccuSoft points to, at best, demonstrates that Snowbound made statements to current customers of AccuSoft, regarding the IFL, that violated the settlement agreement; that Snowbound was aware when doing so that such statements could affect AccuSoft's ability to sell the IFL to its customers; and that some of those customers later became customers of Snowbound. Nothing AccuSoft identifies in the record moves beyond mere circumstantial evidence to directly connect Snowbound's actions with specific lost customers. While such circumstantial evidence of causation may, in certain instances, be adequate, AccuSoft has given us no reason to believe that the master erred in concluding otherwise in this case.

As a final argument on this point, AccuSoft contends that the master committed reversible error by limiting discovery

with respect to damages.  AccuSoft states that discovery was limited to communications between Snowbound and former AccuSoft customers.  AccuSoft was not allowed to investigate what statements were made to other Snowbound customers who may have considered purchasing AccuSoft's product but were unduly influenced by the improper communications.  AccuSoft also argues that it should have been allowed to investigate Snowbound's financial condition.  With this information, AccuSoft contends, it could have developed the necessary evidence concerning its damages.

The master, in his memorandum, noted that AccuSoft had failed, on the basis of the discovery it was allowed, to produce any evidence that would lead him to believe that further discovery was justified.  AccuSoft was not able to point to any of its own communications with customers suggesting that they had information relevant to whether Snowbound's conduct caused AccuSoft's damages.  Nor had the limited discovery of customers who had switched from AccuSoft to Snowbound suggested that such information would be revealed through additional discovery.  The master acknowledged that, given the "substantial difficulties in getting third-parties to permit themselves to become involved in this kind of dispute," it was not fair to "infer that such information would not be helpful to Accusoft."  On the other

hand, he concluded that he could not simply "assume . . . that AccuSoft's loss of revenues or Snowbound's receipt of revenues are the result of the improper conduct by Snowbound" (emphasis in original).

Here too, precedent suggests a highly deferential standard of review. During the performance of his duties, a master is "functionally indistinguishable from . . . a trial judge." Jenkins v. Sterlacci, 849 F.2d 627, 634 (D.C. Cir. 1988). Trial judges "enjoy broad discretion in the handling of interstitial matters, such as the management of pretrial discovery." FDIC v. Ogden Corp., 202 F.3d 454, 460 (1st Cir. 2000). While such decisions are not immune from review, they will only be reversed "upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party." Id. AccuSoft has identified no facts or precedent that convince us that the master was "plainly wrong" in limiting discovery as he did. To the contrary, it appears to us that the master's decision to disallow further discovery was firmly grounded in his factual findings, which AccuSoft does not meaningfully dispute. We therefore affirm.

-64-

c. Finding that Settlement Agreement Transferred "Ownership" of the IFL to Snowbound

In the proceedings below, AccuSoft alleged, and the master found, that Snowbound had offered to sell or renew licenses for the IFL and, in at least a few instances, actually sold or renewed such licenses. AccuSoft argued that this violated the settlement agreement because, although the agreement transferred to Palo AccuSoft's rights in the underlying code, it did not transfer any rights in the product named the Image Format Library. The master rejected AccuSoft's contention, noting that, in his view, the settlement agreement should be interpreted as transferring "all of AccuSoft's interest in the IFL" to Palo. He also indicated that the lack of clarity in the settlement agreement concerning the interest that was transferred to Palo precluded finding of contempt in any event.

On appeal, AccuSoft renews its argument that the master erroneously interpreted the agreement and that only ownership of the underlying code was transferred to Snowbound. AccuSoft notes that the language of the Assignment of Copyright, which states that AccuSoft will transfer "all of its right, title, and interest in and to all computer programs or other software that have at any time to date been sold under the name 'AccuSoft Image Format Library,'" does not expressly transfer ownership of

the IFL name, or any IFL documentation, or customer contacts or goodwill associated with the IFL. AccuSoft also points out that the settlement agreement strictly limits what Snowbound could say concerning ownership of the IFL, and specifically prohibits Snowbound from "trading in any manner upon the goodwill attached to the name 'AccuSoft.'" Finally, AccuSoft identifies record evidence suggesting that Palo and Wieczner were not particularly concerned with gaining the ability to sell the IFL code qua IFL (rather than under the name RasterMaster) when they were negotiating the settlement agreement.

As a matter of contractual interpretation, we find significant merit in AccuSoft's argument. We do not read the agreement to unambiguously transfer to Palo ownership of the IFL product, as opposed to its underlying code. Further, we find that AccuSoft makes a compelling case that other provisions -- such as those concerning publicity and the protection of AccuSoft's goodwill -- suggest that the parties did not intend that Snowbound would license the IFL. In this context we note that the settlement agreement's express statement that Snowbound could publicize its ability to "support" the IFL after August 31, 1996, may also be read to imply that Snowbound could not publicize its ability to take other actions with respect to the IFL. These provisions, taken together, lead us to believe that

Snowbound was not authorized by the settlement agreement to sell the product under the IFL name.

We are less certain that AccuSoft has advanced compelling grounds to reverse the master's conclusion that Snowbound's actions did not constitute civil contempt. First, as the master's opinion makes clear, the language of the settlement agreement is not unambiguous on this issue. While we feel that the better reading favors AccuSoft's position, we do not believe that the interpretation argued by Snowbound and adopted by the master is entirely without foundation. The lack of a clear directive counsels against a finding of contempt. See, e.g., Project B.A.S.I.C., 947 F.2d at 16.

In addition, we have some doubt whether, from a substantive point of view, anything turns on the prohibition AccuSoft would impose. It seems evident that the settlement agreement would, at least after August 31, 1996, allow Snowbound to tell customers who inquired that it was supporting the IFL and also selling the RasterMaster product, which used the same code as the IFL. We note also that the master found -- and we have affirmed -- that it was permissible to state, after August 31, 1996, that no one was actually selling the IFL anymore. Given Snowbound's evident ability to license the IFL code, to state that such code was formerly contained in the IFL but now

-67-

contained in RasterMaster, and to indicate that the IFL _qua_ IFL was no longer available, Snowbound could only be found to have breached the agreement to the extent that licensing the IFL without such explanation improperly traded on goodwill associated with that name.  In this context, it is noteworthy that the master already considered, and found contemptuous, Snowbound's use of the term IFL in advertisements and Snowbound's use of references to "AccuSoft"

or "Accu" in products it sold, but found no damages associated with these breaches.[25]

Although the above suggests to us that AccuSoft may have difficulty proving contempt, or proving that any damages resulted from such contempt, we believe a remand is necessary to determine whether the factual record may support such a finding if the interpretation of the settlement agreement set out above is applied.  As but one reason for so doing, we note that it is not at all clear, from the record evidence identified by the parties, _when_ Snowbound licensed the IFL.  With the record before us, we cannot conclusively resolve this issue and therefore leave it to the district court to determine.

---

[25]    We also consider it significant that the settlement agreement expressly did not seek to regulate the parties' oral statements, further limiting the conduct surrounding the sales of IFL that could be considered grounds for a finding of contempt.

C.		<u>Attorneys' Fees and Related Costs; Costs of Audit</u>

Finally, the parties appeal aspects of the master's rulings with respect to costs of the master's audit and the award of attorneys' fees and related litigation costs.

1.		<u>Costs of Audit</u>

In its motion papers, AccuSoft argues that, if its appeals concerning the royalties owed to Snowbound are successful, the award of audit costs to Snowbound may need to be revisited.  In charging the entirety of the audit to AccuSoft in his decision below, the master relied on Paragraph 6 of the settlement agreement which states, in relation to the audit, that:

> If the audit discloses that any amount due was underreported or underpaid by more than 5%, AccuSoft will reimburse Palo for one-half of the cost of the audit.  If the audit discloses that any amount due was underreported by more than 10%, AccuSoft will reimburse Palo for the entire cost of the audit.

Because we hold that the master's award of the Lifeboat revenues to Snowbound must be vacated -- an award which constituted the majority of the amount unpaid by AccuSoft – this calculation may indeed change on remand.  We therefore direct the court below to review this question again after the remanded issues are resolved.

2.		<u>Attorneys' Fees and Related Costs</u>

Paragraph 16 of the settlement agreement provides, in relevant part, that:

> If any party should breach any term of this Agreement, the other party will be entitled to move for contempt of the Order, to an award of its actual damages sustained by reason of such breach, and to recover its reasonable attorneys' fees and costs incurred in such proceedings . . . .

In his memorandum, the master concluded that the phrase "in such proceedings" must be read as limited to that process in which a party "move[s] for contempt of the Order" to remedy the other party's breach, and, therefore, that the provision only allowed for recovery by a plaintiff in a contempt action. He also found that, by its terms, the provision required that a breach of the agreement be proved before fees could be awarded. However, the master found nothing in the language to limit a party who alleged multiple counts of contempt to obtaining attorneys' fees associated with its "successful" contempt claims. Nor did he view the language as requiring the party to meet the definition of a "prevailing party" as it is used in statutory fee-shifting provisions; a definition which typically requires that some damages be proven. Cf. PH Group, Ltd. v. Birch, 985 F.2d 649, 652 (1st Cir. 1993) (citing to cases indicating that the award of zero or merely nominal damages may not convey prevailing-party status).

Based on this interpretation, the master found that AccuSoft was entitled to recover the reasonable fees it incurred in prosecuting its motion for contempt against Snowbound. In calculating the fees, the master employed the lodestar time and rate analysis. See Tennessee Gas Pipeline Co. v. 104 Acres of Land, 32 F.3d 632, 634 (1st Cir. 1994) (noting our preference for the lodestar time and rate method "if an alternative method is not expressly dictated by applicable law"). Following several rounds of submissions from AccuSoft, the master determined that $135,102 in attorneys' fees and $14,143 in related costs (travel costs, constable fees, etc.) were properly attributable to AccuSoft's prosecution of its contempt action and thus recoverable. Because the master found that Snowbound had not succeeded in proving that AccuSoft was in contempt of any aspect of the settlement agreement, Snowbound was awarded no fees.

On appeal, both parties challenge the master's interpretation of the settlement agreement language. AccuSoft argues that it should be allowed to recover the entirety of its attorneys' fees and costs, including those expended in successfully defending itself against Snowbound's contempt allegations. Snowbound, in turn, argues that AccuSoft is entitled to recover none of its fees and costs, because, in

determining the "reasonableness" of the fee award, the master should have considered AccuSoft's failure to obtain any of the relief it sought.  Snowbound also argues that, because the master should have found AccuSoft to have breached the agreement, Snowbound should have received an award of attorneys' fees.

We see no reason to disturb the master's conclusion that, under the terms of the settlement agreement, a party may recover fees for prosecuting a contempt action but may not recover fees incurred in defending against a claim of contempt. The language of the settlement agreement supports this interpretation and AccuSoft has provided no precedent or extrinsic evidence that casts any doubt on its correctness.  On the other hand, we find merit in Snowbound's contention that the master should have given consideration to AccuSoft's success (or lack thereof) in determining the amount of fees it could recover.

In doing so we acknowledge that, when a contractual fee provision is included by the parties, the question of what fees are owed "is ultimately one of contract interpretation," and our primary obligation is simply to honor the agreement struck by the parties.  MIF Realty, L.P. v. Fineberg, 989 F. Supp. 400, 402 (D. Mass. 1998); see also United States v. Western States

-72-

Mech. Contractors, Inc., 834 F.2d 1533, 1548 (10th Cir. 1987) (noting that "where contracting parties have agreed that a breaching party will be liable for attorneys' fees, the purpose of the award [of such fees] is to give the parties the benefit of that bargain, and the court's responsibility is to enforce that bargain"). We are also aware of precedent suggesting that the court's discretion in awarding fees is more limited where the parties have specifically agreed that fees will be paid under certain circumstances. See Cable Marine v. M/V Trust, 632 F.2d 1344, 1345 (5th Cir. 1980) ("Where attorney's fees are provided by contract, a trial court does not possess the same degree of equitable discretion to deny such fees as it has applying a statute providing for a discretionary award."); Western States, 834 F.2d at 1548 ("Normally, where the court is merely enforcing a contractual provision authorizing attorney's fees, the fees are routinely awarded . . . .").

Nonetheless, we find nothing in precedent to suggest that the master could properly exclude consideration of AccuSoft's overall success as a factor in determining the appropriateness of its fee award. To the contrary, Massachusetts law suggests that success is a factor that must be considered when fixing the fees to be awarded pursuant to a contractual provision. In First Nat'l Bank of Boston v. Brink,

361 N.E.2d 406, 410-11 (Mass. 1977), for example, the Supreme Judicial Court of Massachusetts specifically approved the trial court's application, in determining a fee award pursuant to a contractual provision, of the factors set forth in Cummings v. Nat'l Shawmut Bank, 188 N.E. 489, 492 (Mass. 1934). These factors include "the ability and reputation of the attorney, the demand for his services by others, the amount and importance of the matter involved, the time spent, the prices usually charged for similar services by other attorneys in the same neighborhood, the amount of money or the value of the property affected by controversy, and the results secured." Cummings, 188 N.E. at 492 (emphasis added). Other opinions applying Massachusetts law appear to reach a similar result. See, e.g., Northern Heel, 951 F.2d at 476-77 (discussing application of Cummings factors in determining reasonableness of fees awarded under contractual provision); MIF Realty, 989 F. Supp. at 402 (same); Taupa Lithuanian Fed. Credit Union v. Bajercius, 1997 Mass. App. Div. 31, 32 (same). Furthermore, even where courts have adopted a comparatively narrow view of their discretion where contractual provisions are concerned, they have recognized the ability to "adjust or even deny a contractual award of fees if such an award would be inequitable or unreasonable." Western States, 834 F.2d at 1548. This standard has been employed to

deny the award of fees pursuant to contract when the party has met with scant success in its action.  See Rent It Co. v. Aetna Cas. & Sur. Co., 988 F.2d 88, 91 (10th Cir. 1993) (holding that the lower court acted within its discretion in denying as "inequitable and unreasonable" any award of fees "[g]iven the more than eight-to-one ratio of damages sought to damages recovered").

In light of this, we believe that the contractual provision at issue here is appropriately interpreted to require consideration of all relevant factors, including the results obtained by the parties, in determining the reasonableness of the fees requested.  On remand, the district court, or the master, if the order of reference is renewed, should include these considerations in determining whether the fee awards are appropriate in light of the reasoning set forth in this opinion and the proceedings on remand.  We realize that, as the master noted below, it may not be possible or appropriate to distinguish the fees associated with successful and unsuccessful claims.  We also do not mean to suggest that AccuSoft's failure to obtain damages or other requested relief is necessarily fatal to its claim for attorneys' fees. Ultimately, the determination of what fees are properly awarded under this standard lies within the sound discretion of the finder of fact.

As a final point, we note that AccuSoft has requested that it be awarded its fees for these appeals pursuant to Paragraph 16 of the settlement agreement. Whether, or under what circumstances, fees should be awarded for appellate advocacy pursuant to a contractual agreement "is one largely of judicial discretion, since the provision or stipulations involved usually do not contain explicit reference to fees on appeal." Robert L. Rossi, Attorney's Fees 492 (1995). Because the question of attorneys' fees will be revisited on remand in any event, and should properly be evaluated in light of the district court's final conclusions on remand regarding aspects of the substantive relief awarded the parties, we instruct AccuSoft and Snowbound to make their case for the fees associated with these appeals at that time.

IV.

Our conclusions may be summarized as follows. With respect to the allocation of the Lifeboat revenues, the decision of the master is vacated and the matter is remanded for a determination of what royalties, if any, are owed to Snowbound on this income. In addition, the master's conclusion that Snowbound's sales of the IFL did not constitute contempt is vacated and the matter remanded for further proceedings consistent with Part II.B.2.c of this opinion. On remand, we further direct that the district court address the issue of whether AccuSoft may have been in contempt for failing to maintain sequential serial numbers of its IFL sales, an issue that was not fully resolved below. Finally, we direct that, on remand, the awards of audit costs and attorneys' fees be reconsidered in view of the standards discussed in Part II.C of this opinion and changes in the substantive relief obtained by the parties on remand. In all other respects, we affirm the judgment of the district court.

**It is so ordered.** **No costs.**